1998-NMSC-051

972 P.2d 344

**Lee Roy KITCHELL, Plaintiff–Appellee,**

v.

**PUBLIC SERVICE COMPANY OF NEW MEXICO, Defendant–Appellant.**

No. 24,080.

Supreme Court of New Mexico.

Dec. 3, 1998.

Keleher & McLeod, P.A., Robert C. Conklin, Thomas C. Bird, Albuquerque, for appellant.

Titus & Murphy, Victor A. Titus, Farmington, for appellee.

## OPINION

McKINNON, J.

{1} This interlocutory appeal raises three issues relating to the termination of the employment of plaintiff-appellee Lee Roy Kitchell with defendant-appellant Public Service Company of New Mexico ("PNM").[1] The issues concern each of three counts in Kitchell's complaint, and the denial by the trial court as to each count of PNM's motion for summary judgment. The complaint presents these legal arguments: 1) that an employee, totally disabled by a work-related injury, can be considered "otherwise qualified" to work and therefore bring an employment discrimination suit under the New Mexico Human Rights Act, NMSA 1978, § 28–1–7(A) (1995); 2) that an employer who is self-insured for workers' compensation and who maintains a self-funded health indemnity plan for employees is subject to suit under the New Mexico Unfair Insurance Practices Act, NMSA 1978, §§ 59A–16–1 to –30 (1984, as amended through 1997); and 3) that an action for prima facie tort is possible where an employer terminates an employee and stops his health benefits because the employee is disabled due to a job-related injury. We reverse the trial court as to all three counts.

{2} Kitchell had been a power plant mechanic at PNM's San Juan Generating Station. After being employed for eight and a half years, on April 6, 1989, he was hospitalized with severe eczema contracted as a result of the working conditions at his job. From the time of his disability, Kitchell has received social security benefits and workers' compensation. On August 9, 1991, he filed a workers' compensation claim for permanent total disability benefits. He also received benefits under PNM's self-funded health indemnity plan from the time of his disability until March of 1992, when his employment was terminated. His complaint is based on the alleged wrongfulness of the termination of these company health benefits.

{3} "The extreme remedy of summary judgment must be used with caution." *Rummel v. St. Paul Surplus Lines Ins. Co.*, 1997–NMSC–042, ¶ 9, 123 N.M. 767, 945 P.2d 985. "Where there is a question as to any issue of material fact, summary judgment is inappropriate." *Id.* "In reviewing the grant or denial of summary judgment, this Court considers the undisputed facts, and determines whether under those facts summary judgment was proper as a matter of law." *Id.*

{4} Count I of Kitchell's complaint alleges that he was discharged and his health benefits terminated in violation of the Human Rights Act, Section 28–1–7, which provides in relevant part:

It is an unlawful discriminatory practice for: A. an employer, unless based on a bona fide occupational qualification, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person *otherwise qualified* because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition . . . .

(Emphasis added). Kitchell claims he was discharged and discriminated against because of his physical handicap/serious medical condition when his employment and health benefits were terminated because of the total disability he incurred on the job. PNM claims he is not "otherwise qualified"

---

1. The interlocutory appeal was originally docketed in the Court of Appeals but later transferred to this Court pursuant to NMSA 1978, § 28–1–13(C) (1983).

as required because he is *totally* disabled. Furthermore, PNM points out that Kitchell has claimed total disability for purposes of receiving workers' compensation (and, apparently, social security) and is therefore judicially estopped from claiming that he is "otherwise qualified" under the Human Rights Act. Kitchell counters that an employer should not be permitted to essentially cause the disability of a worker and then be allowed to cut off health benefits.

{5} In the typical employment discrimination case, the plaintiff has the initial burden of showing: "(1) that he or she is a member of a protected class; (2) that he or she was qualified to continue employment; (3) that his or her employment was terminated; and (4) that his or her position was filled by someone not in the protected class." *Martinez v. Yellow Freight Sys., Inc.*, 113 N.M. 366, 368, 826 P.2d 962, 964 (1992) (footnote omitted). However, "[a] prima facie case may also be made out through other means; not all factual situations will fit into any one type of analysis, although unlawful discrimination may nevertheless be present." *Smith v. FDC Corp.*, 109 N.M. 514, 518, 787 P.2d 433, 437 (1990). Whatever analysis is used, the statute here requires that the plaintiff show he or she was "otherwise qualified" for the employment, and indeed that is the only *Martinez* element at issue here.

■ {6} The term "otherwise qualified" refers to a person who, though affected by a handicap or medical condition, maintains the underlying ability to do the job. Construing a similar statute, the Montana Supreme Court said:

Taken literally, "otherwise qualified" could be defined to include those persons who would be able to meet the particular requirements of a particular program "but for" the limitations imposed by their handicaps. The Supreme Court [, *Southeastern Community College v. Davis*, 442 U.S. 397, 406–07, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) ], however, expressly disapproved of such an interpretation because of the absurd results that would be produced. "Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be 'otherwise qualified' for the job of driving. Clearly such a result was not intended by Congress." The Supreme Court instead defined an otherwise qualified person as "one who is able to meet all of the program's requirements *in spite* of his handicap." (Emphasis in original.)

*Hafner v. Conoco, Inc.*, 268 Mont. 396, 886 P.2d 947, 951 (1994) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993)). In *Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768, 769 (8th Cir.1987), a teacher became hospitalized and unable to work due to pressures on the job. After a period of time, she was denied salary continuation and health and dental benefits. She sued under § 504 of the Rehabilitation Act of 1973, which prohibited discrimination against "otherwise qualified handicapped individuals" by recipients of federal financial aid. *Id.* at 770. The court discussed *Southeastern Community College*, and concluded:

Thus both the language of the statute and its interpretation by the Supreme Court indicate that section 504 was designed to prohibit discrimination within the ambit of an employment relationship in which the employee is potentially able to do the job in question. *Though it may seem undesirable to discriminate against a handicapped employee who is no longer able to do his or her job, this sort of discrimination is simply not within the protection of Section 504.*

*Id.* at 771 (emphasis added).

■ {7} PNM argues that Kitchell is judicially estopped, based on his workers' compensation claim, from asserting that he is "otherwise qualified." We need not adopt a per se rule of judicial estoppel in order to resolve this case. *See Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 n. 3 (9th Cir.1996). Kitchell admitted in his worker's compensation claim that his injury prevented him "from engaging, for remuneration or profit, in any occupation for which he is or becomes fitted by age, training, or experience." NMSA 1978, § 52-1-25(A) (1987, prior to 1991 amendment). As a result, Kitchell has admitted that he is not "otherwise qualified," and there is no evidence raising a reasonable

doubt as to the existence of a genuine issue of material fact on this point.

■ {8} Kitchell argues that it is fundamentally unfair when an employer who is responsible for a worker's disability is permitted to terminate the worker and end company benefits. To the extent that this may be true, we do not believe the Human Rights Act was designed to provide a remedy in such a case, as the above authorities demonstrate. Kitchell is concerned not so much with his "human" rights—one of which is the freedom from discrimination in employment—as with his "employee" rights, specifically how a totally disabled employee is to be treated. That territory is covered by workers' compensation and social security laws. *See Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 12, 122 N.M. 524, 928 P.2d 250, ("The Act is intended only to prevent the worker from becoming a public charge....) Since Kitchell is barred as a matter of law from recovery under the Human Rights Act, the denial of summary judgment as to the first count of his complaint is reversed.

{9} The second count in Kitchell's complaint alleges that PNM was an insurer within the meaning of the New Mexico Unfair Insurance Practices Act, NMSA 1978, § 59A–16–1 et seq. (1984), and that by terminating his health benefits it practiced "unfair discrimination between insureds" in benefits payable, contrary to NMSA 1978, § 59A–16–17D (1984). He therefore seeks a private remedy as allowed under NMSA 1978, § 59A–16–30 (1990). Kitchell points out that PNM is "self-insured" in two relevant areas—workers' compensation and workers' health benefits—and argues that an entity which is self-insured is an insurer for purposes of the Act. PNM in turn relies on *Levi Strauss & Co. v. N.M. Property & Cas. Ins. Guaranty Assn. (In re Mission Ins. Co.)*, 112 N.M. 433, 436–37, 816 P.2d 502, 505–06 (1991), where we held that an entity self-insured for workers' compensation is not an insurer within the meaning of the Insurance Code, NMSA 1978, § 59A–1–8(A) (1984) (defining "insurer" as "every person engaged as principal and as indemnitor, surety or contractor in the business of entering into contracts of insurance.")

{10} We find there is a potential for differences between the two types of insurance in question here. In the workers' compensation setting, coverage is required by law and the worker is compensated for his or her injury without proof of fault. NMSA 1978, § 52–1–2 (1987), –4 (1989). This means that the financial risk connected with an incident falls primarily on the employer, who is required to certify either 1) that it has current insurance to cover workers' claims, or 2) that it is financially solvent so that insurance coverage is unnecessary. NMSA 1978, § 52–1–4(A) (1990). At the time an injury occurs, it is the employer or its insurance carrier who is liable. § 52–1–4(C). In this sense, a self-insurer has insured itself, since it bears all the financial risk, and has not *insured* the worker, who is entitled to be *compensated* as a separate matter from how the employer is insured for the loss. *See Levi Strauss*, 112 N.M. at 436–37, 816 P.2d at 505–06.

■ {11} In *Richardson v. GAB Business Services, Inc.*, 161 Cal.App.3d 519, 207 Cal.Rptr. 519, 521 (1984), the plaintiff suffered a personal injury on the premises of Safeway, which was self-insured against such risks, and sued defendant claims adjuster under the California unfair insurance practices act. The court rejected the claim on the basis that Safeway had insured itself, not the plaintiff: "The allegation of self-insurance, which is equivalent to no insurance, is repugnant to the concept of insurance which fundamentally involves the shifting to a third party, by contract, for a consideration, the risk of loss as a result of an incident or event." *Id.* Here again, it is the entity that is insured, and the entity's risk that is insured against. The person suffering the injury has a workers' compensation claim or a personal injury claim, not an insurance claim. Therefore, PNM was *not* an insurer of Kitchell merely because it could be liable as an employer for the payment of compensation.

{12} What is more, in 1990, the Legislature amended the Workers' Compensation Act, NMSA 1978, § 52–1–28.1 (1991), to include workers' claims for "unfair claim-processing practices or bad faith by an employer, insurer, or claim-processing representative relating to any aspect of the

Workers' Compensation Act." This change brought all such claims within the exclusivity provision of the Act, *see* NMSA 1978, § 52–1–6(E) (1990) (stating that Act provides exclusive remedy). *See generally Cruz v. Liberty Mut. Ins. Co.,* 119 N.M. 301, 303, 889 P.2d 1223, 1225 (1995). Thus again, no suit against PNM by Kitchell in its capacity as a workers' compensation employer is proper under the New Mexico Unfair Insurance Practices Act.

{13} Although not obligated to do so by law, PNM voluntarily provided as a benefit to its employees a self-funded health indemnity plan. Kitchell argues that the operation and administration of the plan constitutes "transacting insurance" and therefore the New Mexico Unfair Insurance Practices Act applies to PNM. We disagree.

{14} To come within the ambit of the Act, there must be substantial evidence that PNM is "transacting insurance" within the meaning of NMSA 1978, § 59A–1–13 NMSA 1978 (1991) which requires, at least, proof of one of the following activities:

A. solicitation or inducement;

B. negotiation;

C. effectuation of an insurance contract;

D. transaction of matters subsequent to effectuation and arising out of such a contract;

E. maintenance [in New Mexico] of an office or personnel performing any function in furtherance of an insurer's business of insurance; or

F. maintenance by an insurer of assets in trust in this state for the benefit, security, or protection of its policyholders or its policyholders and creditors.

In support of PNM's argument that it was not transacting insurance, a Human Resource analyst stated in her affidavit that PNM does not transact or solicit insurance business; that it does not negotiate, effectuate, or transact insurance contracts or coverage with individual employees; and that it does not issue insurance policies or otherwise engage in the insurance business. PNM thus made a prima facie showing that there was no issue of material fact, and Kitchell did not rebut this showing with evidence demonstrating a reasonable doubt as to the existence of a genuine issue of fact. *See Ciup v. Chevron U.S.A., Inc.,* 1996–NMSC–062, ¶ 7,122 N.M. 537, 928 P.2d 263. We conclude that under the undisputed material facts PNM was not engaged in the business of insurance, nor was or has it been "transacting insurance" at any relevant times. *See* § 59A–1–13. Finally, we note that at all material times the parties stipulated that PNM was self-insured, and we conclude it was not engaged in the business of transacting insurance. We therefore reverse the order denying PNM's motion for summary judgment as to count II.

{15} The third count of the complaint on which summary judgment was denied is for prima facie tort. Kitchell describes PNM's act as "a lawful act which Defendant did with intent to cut off Plaintiff's health insurance, which they knew would injur[e] Plaintiff and his family, as has precisely happened." The elements of prima facie tort were stated in the leading case of *Schmitz v. Smentowski,* 109 N.M. 386, 394, 785 P.2d 726, 734 (1990), and in *Lexington Ins. Co. v. Rummel,* 1997–NMSC–043, ¶ 10, 123 N.M. 774, 945 P.2d 992. They are 1) an intentional and lawful act, 2) an intent to injure the plaintiff, 3) injury to the plaintiff as a result of the intentional act, and 4) the absence of justification for the injurious act. Prima facie tort is not intended to provide a remedy for every intentionally caused harm, rather, it is a remedy for acts committed with intent to injure the plaintiff and without justification. Therefore, balancing the intent to injure the defendant against both the justification for the injurious act and the severity of the injury is a necessary step in determining whether a prima facie tort has been committed. *Lexington Ins. Co.,* 1997–NMSC–043, ¶ 11, 123 N.M. 774, 945 P.2d 992. If "there is no evidence of an intent to injure, there is no need to proceed with the balancing test." *Id.*

{16} There is no question that PNM committed an intentional act. The issue presented by Kitchell's claim is where the intent was directed. It is held that "proof on the element of intent to injure must be of an 'actual intention' to injure, not merely an

intent to do the act which may result in the claimed injury." *Lexington Ins. Co.*, 1997–NMSC–043, ¶ 14, 123 N.M. 774, 945 P.2d 992, quoting *Boatmen's Bank of Butler v. Berwald*, 752 S.W.2d 829, 833 (Mo.Ct.App.1988). The facts adduced by Kitchell tend to prove only that PNM intentionally terminated him from his employment and ended his right to company-paid health insurance. He bears a "heavy burden" in proving that PNM had an actual intent to injure him. *Lexington Ins. Co.*, 1997–NMSC–043, ¶ 12, 123 N.M. 774, 945 P.2d 992.

{17} Without asking what the justification for PNM's act might have been, which is the next step in the analysis, we need to discern the intent of PNM. "The terms malice and intent to injure have been used synonymously with our jurisprudence on prima facie tort." *Id.* ¶ 10. Malice in turn is the "intentional doing of a wrongful act without just cause or excuse. This means that the defendant not only intended to do the act which is ascertained to be wrongful, but that he knew it was wrong when he did it." *Flores v.. Baca*, 117 N.M. 306, 312, 871 P.2d 962, 968 (1994) (internal quotation marks and citations omitted); *see also Jones v. Citizens Bank of Clovis*, 58 N.M. 48, 51, 265 P.2d 366, 368 (1954).

{18} There is no evidence that PNM intended to harm or injure Kitchell when his health benefits were terminated almost three years after which he became totally disabled and unable to perform any work for PNM. By then he had received over $160,000 in social security and workers' compensation benefits as well as continuous benefits from PNM's self-funded health plan. Certainly, this is not evidence of an intent to harm Kitchell especially since the termination could have occurred any time after he became permanently and totally disabled. Further, the Human Rights Commission found PNM innocent of any discrimination against Kitchell on account of his disabilities. We therefore reverse the order denying PNM's motion for summary judgment as to Count III.

{19} For the foregoing reasons, the judgment of the trial court is reversed and the case is remanded with instructions to dismiss the complaint with prejudice.

{20} **IT IS SO ORDERED.**

FRANCHINI, C.J., BACA, MINZNER, and SERNA, JJ., concur

1998-NMCA-074