1999-NMCA-067

981 P.2d 1234

David J. PADWA, Plaintiff–Appellant,

v.

Drummond HADLEY, Defendant–Appellee.

No. 19,038.

Court of Appeals of New Mexico.

April 15, 1999.

Certiorari Denied, No.25,740, May 25, 1999.

Aaron J. Wolf, White, Koch, Kelly & McCarthy, P.A., Santa Fe, Jane Bloom Yohalem, Santa Fe, for appellant.

Robert R. Rothstein, John L. Sullivan, Rothstein, Donatelli, Hughes, Dahlstrom, Cron & Schoenburg, LLP, Santa Fe, Gregory L. Biehler, Beall & Biehler, P.A., Albuquerque, for appellee.

## OPINION

BOSSON, Judge.

{1} On the Court's own motion the following opinion is substituted for that filed March 17, 1999. The motion for rehearing is denied.

{2} This appeal presents novel questions regarding the torts of intentional infliction of emotional distress, and, to a lesser extent, prima facie tort. We examine the kinds of behavior that, although immoral and personally offensive, may not rise to the level of actionable civil claims under law. In this case Plaintiff Padwa seeks compensatory damages from Defendant Hadley for having engaged in a pattern of intrusive and often times sexual behavior with Padwa's wife, his former wife, and his former fiancée, with the intent to cause severe emotional distress and injure Padwa, allegedly without justification for his acts. · After analyzing the conduct alleged and even assuming the truthfulness of all material allegations, we conclude that Padwa does not state a claim for relief in tort under New Mexico law. Accordingly, we affirm the district court's dismissal of the complaint.

## BACKGROUND

{3} The following facts are alleged in Padwa's complaint and are assumed to be true for purposes of our review of an order dismissing the complaint for failure to state a claim upon which relief can be granted. *See* Rule 1–012(B)(6) NMRA 1999. Padwa was divorced from his first wife (former wife) in New York City in 1966. In 1971, he moved away from New York to Santa Fe "because of the sorrowful nature of the divorce." While in Santa Fe he met Hadley, and they became casual friends. Padwa subsequently met another woman (wife), and the couple married in 1973.

{4} In 1981, Padwa went to New York on business. Hadley invited himself along on the trip and shared Padwa's hotel room. While in New York, Hadley began asking Padwa intrusive questions about his prior marriage which revealed a prurient interest in Padwa's private life and in his former wife. Padwa was deeply offended and told Hadley so. Padwa was still sensitive about his divorce and remained involved with his former wife because they had a daughter together. According to Padwa, he made clear to Hadley that any intrusion into the privacy of his relationship with his former wife would be extremely painful, especially considering their daughter. Later that night, Padwa returned to his hotel room close to midnight and discovered that Hadley had left a note telling Padwa that he had gone over to Padwa's ex-wife's house. Hadley returned at approximately 2:15 a.m. Padwa was incensed at Hadley's callousness and ended his friendship immediately.

{5} For the next four or five years, Hadley sought unsuccessfully to resume a friendly discourse with Padwa, but Padwa wanted nothing to do with him and told him repeatedly how disgusted he was at Hadley's behavior, how much he had hurt him, and that he wanted Hadley to stay away from him and his family. Years later in 1994, Hadley telephoned Padwa at his home in Santa Fe, and in a conciliatory gesture Padwa invited him over to his house to "let bygones be bygones." Padwa then described to Hadley how he had become separated from his wife, how he had then become engaged to another woman (ex-fiancée), how he had ended the engagement for the sake of reclaiming his marriage, and finally that he and his wife were together again and fully reconciled for nearly a year. He also explained to Hadley that he continued to have a warm and platonic friendship with his ex-fiancée.

{6} Within days of this conversation, Hadley initiated a sexual relationship with Padwa's wife. A few months later, Hadley sought out Padwa's ex-fiancée and began a sexual relationship with her as well. Hadley told the ex-fiancée about his affair with Pad-

wa's wife, and eventually the ex-fiancée told Padwa. Padwa was stunned and emotionally devastated by the information. He proceeded to divorce his wife.

{7} Padwa was outraged at Hadley's invasion of his private life. As Padwa saw it, Hadley was a sexual predator. Hadley had been told not to become involved with these women, and yet he had done so purposefully, intentionally, and with full knowledge of the severe emotional injury that would follow. In his brief to this Court, Padwa describes Hadley as a man who "repeatedly went to extraordinary lengths" to injure him, and one "who knowingly, intentionally and with mocking cruelty, targets [him], waiting for the opportunity to sexually humiliate him and to hurt him deeply." Continuing, Padwa elaborates that "[s]exual pursuit of these women was [Hadley]'s weapon of choice for attacking and hurting [him]" and that Hadley was "highly effective" in doing so. Padwa filed this lawsuit against Hadley for intentional infliction of emotional distress and, alternatively, for prima facie tort. Pursuant to Rule 1–012(B)(6), the district court dismissed both claims for failure to state a claim upon which relief may be granted, and Padwa appeals from that dismissal.

## DISCUSSION

### Standard of Review

{8} The decision of the trial court to grant Hadley's Rule 12(B)(6) motion is a question of law that we review de novo. *See Wilson v. Denver*, 1998–NMSC–016, ¶ 13, 125 N.M. 308, 961 P.2d 153. We accept all well-pleaded factual allegations as true, and resolve all doubts in favor of the sufficiency of the complaint. *See Anadarko Petroleum Corp. v. Baca*, 117 N.M. 167, 169, 870 P.2d 129, 131 (1994). Therefore, we must examine the legal sufficiency of Padwa's claims, based on the allegations in the complaint, to determine if Padwa is entitled to relief.

### The Tort of Intentional Infliction of Emotional Distress

{9} Initially, the court determines as a matter of law whether conduct reasonably may be regarded as so extreme and outrageous that it will permit recovery under the tort of intentional infliction of emotional

distress. *See Trujillo v. Puro*, 101 N.M. 408, 414, 683 P.2d 963, 969 (Ct.App.1984); Restatement (Second) of Torts § 46 cmt. h (1965). When reasonable persons may differ on that question, it is for the jury to decide, subject to the oversight of the court. *See* Restatement, *supra*. We proceed to define the parameters of what conduct may not reasonably be regarded as actionable in this context.

{10} We first addressed this tort, also known as the tort of outrage, in *Mantz v. Follingstad*, 84 N.M. 473, 480, 505 P.2d 68, 75 (Ct.App.1972), and we considered, but did not take the opportunity to adopt the Restatement, because the plaintiff in that case had failed to disclose any facts that would establish a claim. *See also* E.X. "Javier" Acosta, *The Tort of "Outrageous Conduct" in New Mexico: Intentional Infliction of Emotional Harm Without Physical Injury*, 19 N.M.L.Rev. 425 (1989). We subsequently adopted the Restatement and directly applied it to a claim of intentional infliction of emotional distress in both *Trujillo*, 101 N.M. at 414–15, 683 P.2d at 969–70, and *Dominguez v. Stone*, 97 N.M. 211, 214–15, 638 P.2d 423, 426–27 (Ct.App.1981). In discussing the threshold of liability, the Restatement, *supra*, § 46(1) states that, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Referring to the operative phrase "extreme and outrageous conduct," the commentary to the Restatement cautions that:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement, *supra*, § 46 cmt. d; *accord Mantz*, 84 N.M. at 480, 505 P.2d at 75.

{11} By characterizing conduct as "atrocious and utterly intolerable" and "beyond all possible bounds of decency," the Restatement sets the threshold at the very highest level for conduct to be considered actionable under the tort of outrage. It recognizes that, as part of the price of personal liberty, a free and democratic society must tolerate certain offensive conduct as well as some obnoxious or morally deviant behavior. Accordingly, the mere fact that an actor knows that his conduct is insulting, or will deeply hurt another's feelings is insufficient to establish liability. *See* Restatement, *supra,* § 46 cmt. f; *see also* Daniel Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct,* 82 Colum.L.Rev. 42, 53 (1982). Rather than looking to the courts for relief from the emotional bruising of everyday life, "a certain toughening of the mental hide is a better protection than the law could ever be." Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv.L.Rev. 1033, 1035 (1936). Accordingly, caution is the watchword as we examine whether the tort of outrage ought to encompass the facts of this case.

{12} Before examining those facts, however, we emphasize one notable opinion from this Court that comes the closest to the present case and provides us with special guidance. In *Hakkila v. Hakkila,* 112 N.M. 172, 812 P.2d 1320 (Ct.App.1991), we first applied the tort of intentional infliction of emotional distress to conduct arising out of the marital relationship. *Hakkila* was actually a divorce case with an interspousal tort action for emotional distress subsumed within it. In that opinion, we expressed grave reservations about such claims for damages in tort and cautioned that they should be limited to only the most exceptional set of circumstances. Although the husband in *Hakkila* had been personally and emotionally abusive to his wife, and his conduct was certainly morally offensive and obnoxious, we did not allow the tort to proceed because the facts did not meet this heightened threshold of truly extreme and outrageous conduct. *See id.* at 177–79, 812 P.2d at 1325–27; Heather S. Call, *Intentional Infliction of*

*Emotional Distress in the Marital Context: Hakkila v. Hakkila,* 23 N.M.L.Rev. 387 (1993). We expressly favored a "cautious approach to the tort of intramarital outrage[,]" *Hakkila,* 112 N.M. at 177, 812 P.2d at 1325, and suggested "a very limited scope for the tort in the marital context[,]" *id.* at 176, 812 P.2d at 1324. We expressed our concern that the harshness of litigation might unduly invade the privacy and intimacy inherent in the marital relationship and threaten fundamental personal liberties arising out of it. *See id.* at 177, 812 P.2d at 1325. We concluded, "the threshold of outrageousness should be set high enough—or the circumstances in which the tort is recognized should be described precisely enough, e .g., child snatching—that the social good from recognizing the tort will not be outweighed by unseemly and invasive litigation of meritless claims." *Id.* at 178, 812 P.2d at 1326 (citation omitted). We recognized, of course, that liability does not flow from every act that succeeded in causing even severe emotional distress. *See id.* at 176, 812 P.2d at 1324.

{13} Both sides to this litigation appear to recognize that the *Hakkila* heightened threshold, with its "cautious approach" and "very limited scope," can serve as a helpful model for various kinds of intimate personal relationships, beyond just marriage, and the interpersonal torts that arise from them. That is, relationship partners in various forms (for example, wife, ex-wife, fiancée, paramour), and not just wives and husbands, need similar protection of the right to privacy in their intimate lives. Accordingly, the *Hakkila* heightened threshold is a comfortable fit with the present relationships even though only one of these women was actually married to Padwa when Hadley intervened. *See Jose F. v. Pat M.,* 154 Misc.2d 883, 586 N.Y.S.2d 734, 735–36 (N.Y.Sup.Ct.1992) (stating that the public policy considerations that discourage liability for intentional infliction of emotional distress in marital disputes also apply where the parties were never married but their relationship was akin to a conjugal one). Thus, in light of *Hakkila,* Padwa makes no serious claim that he could sue his former partners, his ex-wife, his present wife, or his former fiancée, for their presum-

ably equal role in these consensual affairs and for their contribution to the emotional injury he claims to have suffered as a consequence. Indeed, Padwa has chosen not to file any such claim of extreme and outrageous conduct against his former partners, perhaps in recognition of its potential futility.

■ {14} Assuming such a claim for damages would not lie against Padwa's former partners, the question that follows is whether a similar claim in tort against Hadley, the alleged seducer of the wife, the former wife or the fiancée, should be subject to any less caution, less "limited scope," and less heightened threshold than would apply if Padwa were suing his former partners directly. In short, the question is: Can Padwa sue Hadley for the emotional distress caused by Hadley's repeated affairs when Padwa likely could not sue the women themselves for the same injuries? For the reasons that follow, we are persuaded that Padwa cannot, and we hold that he must demonstrate the same high standard of extreme and outrageous conduct for maintaining an action against Hadley as he would have to do against his former partners. Finally, we conclude that Padwa has not demonstrated that the facts alleged, even taken as true in the present posture of the case, can meet such a threshold. We base our reasoning upon persuasive precedent elsewhere, upon a compelling analogy to the disfavored tort of alienation of affections, and finally upon important policy factors present in New Mexico's judicial and social fabric that mitigate against recognizing such a tort in this context.

■ {15} As a general rule, engaging in consensual sexual relations, even with another's spouse, does not rise to the level of extreme and outrageous conduct that justifies an action in tort. *See Strauss v. Cilek*, 418 N.W.2d 378, 379–80 (Iowa Ct.App.1987) (refusing to find that the defendant's conduct in participating in a sexual relationship with his friend's spouse over an extended period rises to the level of outrage even though the plaintiff and the defendant had known each other since elementary school and were good friends); *Kunau v. Pillers, Pillers & Pillers, P.C.*, 404 N.W.2d 573, 576 (Iowa Ct.App.1987)

(refusing to hold that the conduct of a dentist making sexual overtures and engaging in sexual affairs with a patient gives rise to an action in the patient's spouse for intentional infliction of emotional distress); *Homer v. Long*, 90 Md.App. 1, 599 A.2d 1193, 1198–1200 (Ct.Spec.App.1992) (dismissing complaint against psychiatrist that seduced the plaintiff's spouse because the psychiatrist owed no duty to the plaintiff). *But see Van Meter v. Van Meter*, 328 N.W.2d 497, 497–98 (Iowa 1983) (Supreme Court of Iowa in a sharply divided opinion could not "conclude as a matter of law that no facts are conceivable under which a claim for intentional infliction of emotional distress could be maintained merely because it, like alienation [of affections claim], arises out of a failed marital relationship"); *Spiess v. Johnson* 89 Or.App. 289, 748 P.2d 1020, 1022–24 (1988) (where the plaintiff claims that a psychiatrist used a sexual relationship with the plaintiff's wife as the means to inflict distress on the plaintiff did not transform the claim to one for alienation of affections and was allowed to proceed on theory of intentional infliction of emotional distress), *aff'd*, 307 Or. 242, 765 P.2d 811 (1988).

{16} An exception arises when a defendant owes a plaintiff an independent duty of care, such as when that defendant also has a special relationship with the plaintiff. For example, when the psychiatrist seducing the wife is also the psychiatrist of the husband, the court will recognize a claim in tort. *See Figueiredo–Torres v. Nickel*, 321 Md. 642, 584 A.2d 69, 75–77 (1991); *see also* Restatement, *supra*, § 46 cmt. e. In such instance, the defendant does more than just intrude into the marriage; he breaches an independent duty of care and loyalty toward the cuckolded spouse. As one court has put it, he is not just " 'the milkman, the mailman, or the guy next door; he [is the plaintiff's] psychologist and marriage counselor.' " *Figueiredo–Torres*, 584 A.2d at 75 (quoting *Strock v. Pressnell*, 38 Ohio St.3d 207, 527 N.E.2d 1235, 1246 (1988) (Sweeney & Douglas, JJ., dissenting)). Without such an independent duty, there is no tort of outrage. Of course, the patient seduced by her doctor may have her own action for abuse of trust,

but we note that in the case at hand none of the women formerly involved with Padwa have protested, much less sued for, the consequences of their freely elected relationship with Hadley. *See Erickson v. Christenson,* 99 Or.App. 104, 781 P.2d 383, 385–86 (1989) (church parishioner allowed to sue her pastor for sexual abuse and intentional infliction of emotional distress); *cf. Homer,* 599 A.2d at 1198 (where court stated that "[t]here is no doubt that [the defendant's] conduct, as alleged, would be extreme and outrageous as to [the plaintiffs' wife], who, so far at least, has not chosen to complain of it"); *Lund v. Caple,* 100 Wash.2d 739, 675 P.2d 226, 228 (1984) (en banc) (where allegedly seduced wife refused to join her husband's lawsuit against the defendant-seducer).

■ {17}  Padwa and Hadley, of course, had no such special relationship between them; they were merely casual friends. Neither had any special power or authority over the other, and neither had any special responsibility for the other. Accordingly, the prevailing view in those cases from other jurisdictions that have addressed a similar situation is that Padwa's claim, and Hadley's conduct, do not rise to the necessary level to justify the tort of outrage. *See Strauss,* 418 N.W.2d at 379–80; *Kunau,* 404 N.W.2d at 576; *Homer,* 599 A.2d at 1193; *Lund,* 675 P.2d at 226.

{18}  The closest New Mexico parallel is the common law action for alienation of affections which authorized a husband to sue another for interference with his supposed "right" to the undiluted affections of his spouse. *See Thompson v. Chapman,* 93 N.M. 356, 358, 600 P.2d 302, 304 (Ct.App. 1979). This Court has previously expressed its "disfavor" with such claims. *See id.; see also Hakkila,* 112 N.M. at 177–78, 812 P.2d at 1325–26. In *Thompson,* 93 N.M. at 358, 600 P.2d at 304, we explained our reasoning for concluding that the common law claim of alienation of affections should be abolished in New Mexico. We observed that the claim

diminishes human dignity. It inflicts pain and humiliation upon the innocent, monetary damages are either inadequate or punitive, and the action does not prevent human misconduct itself. In our judg-

ment, the interests which the action seeks to protect are not protected by its existence, and the harm it engenders far outweighs any reasons for its continuance.

*Id.* (quoting *Wyman v. Wallace,* 15 Wash. App. 395, 549 P.2d 71, 74 (1976) (per curiam), *aff'd,* 94 Wash.2d 99, 615 P.2d 452 (1980)); *cf. Birchfield v. Birchfield,* 29 N.M. 19, 22, 217 P. 616, 617 (1923) (originally adopting tort of alienation of affections as part of common law in New Mexico). Although our Supreme Court has not yet formally abandoned the doctrine, in *Lovelace Medical Center v. Mendez,* 111 N.M. 336, 343, 805 P.2d 603, 610 (1991), it cited *Thompson* with apparent approval in support of the proposition that "not all interests which individuals claim as worthy of legal protection are in fact afforded such protection under our law." *Thompson* is in accord with prevailing precedent elsewhere that has rejected the common law action for alienation of affections. *See, e.g., O'Neil v. Schuckardt,* 112 Idaho 472, 733 P.2d 693, 697–98 (1986) (abolishing alienation of affections action based on public policy considerations); *Fundermann v. Mickelson,* 304 N.W.2d 790, 791–94 (Iowa 1981) (en banc) (abolishing alienation of affections action because the theory is rooted in ideas that society has long since renounced); *Hoye v. Hoye,* 824 S.W.2d 422, 423 (Ky.1992) (abolishing tort of intentional interference with marital relation because the foundation of the action is based on antiquated misperceptions); *Thomas v. Siddiqui,* 869 S.W.2d 740, 742 (Mo.1994) (en banc) (abolishing tort of criminal conversation and recognizing society's intent not to punish adultery); *Weicker v. Weicker,* 22 N.Y.2d 8, 290 N.Y.S.2d 732, 237 N.E.2d 876, 876–77 (1968) (per curiam) (refusing to recognize interspousal claim for intentional infliction of emotional distress because it would subvert the legislative intent behind statute abolishing a cause of action for alienation of affections); *McGrady v. Rosenbaum,* 62 Misc.2d 182, 308 N.Y.S.2d 181, 190 (N.Y.Sup.Ct.1970) (holding that the plaintiff's complaint failed to state a cause of action because plaintiff's claim was basically an action for alienation of affections which was barred by statute), *aff'd,* 37 A.D.2d 917, 324 N.Y.S.2d 876 (N.Y.App.Div.1971).

{19} The foregoing cases from New Mexico and elsewhere share the common concern, grounded in sound public policy, against undue interference in consensual sexual relations between adults. *See Browning v. Browning,* 584 S.W.2d 406, 407–08 (Ky.Ct. App.1979). A spouse's love or a lover's companionship is not property that is subject to theft or trespass, and "plaintiffs in such suits do not deserve to recover for the loss of or injury to 'property' which they do not, and cannot, own." *Kunau,* 404 N.W.2d at 579 (Sackett, J., specially concurring) (citing *Fundermann,* 304 N.W.2d at 794). "[The action] disregards the volitional act of the other spouse[, ex-spouse, or ex-lover] that is essential to the termination [of the marriage or love affair], and it denigrates the institution of marriage by making a forced sale of spousal affections." *Van Meter,* 328 N.W.2d at 498 (McCormick, J., dissenting). Such a tort inevitably threatens the same privileged conduct attendant to intimate personal affairs that proved so decisive in *Hakkila. See id.,* 112 N.M. at 177, 812 P.2d at 1325; *see also* Restatement, *supra,* § 46 cmt. g (noting that an actor will never be liable for conduct, although otherwise extreme and outrageous, that is privileged).

{20} It is difficult to envision how the cuckolded spouse or lover could successfully state a claim in tort against the third party, whatever the label, without simultaneously trammelling the privacy rights and liberty interests of the other spouse, or the former spouse or partner. We do not see how we could recognize such conduct as tortious and not, in effect, create a legal right in a husband or paramour to the affections and loyalty of his partner. A person may have such a moral claim to marital loyalty, or a lover's fidelity, and a moral right to be free from the sexual blandishments of an interloper. However, "the morals of mankind are more perfectly judged by a court having a final and eternal jurisdiction." *Browning,* 584 S.W.2d at 408. We are left with the conclusion that, no matter how offensive, immoral, or injurious, "certain sexual conduct and interpersonal decisions are, on public policy grounds, outside the realm of tort liability." *Perry v. Atkinson,* 195 Cal.App.3d 14, 240 Cal.Rptr. 402, 405 (1987). While not stating a categori-

cal rule, we conclude that the freely-made sexual decisions between adults in this case are not actionable in tort.

■ {21} Padwa relies on certain cases from other jurisdictions, such as *Muratore v. M/S Scotia Prince,* 656 F.Supp. 471, 480–82 (1987), *aff'd in part & vacated in part by,* 845 F.2d 347 (1st Cir.1988), *Boyle v. Wenk,* 378 Mass. 592, 392 N.E.2d 1053, 1054–56 (1979), and *Bartanus v. Lis,* 332 Pa.Super. 48, 480 A.2d 1178, 1183–86 (1984), to support his argument that the force of repetition made Hadley's conduct with the three women extreme and outrageous. Padwa's reliance on these cases is misplaced. The mere fact of repetition, alone, does not make behavior outrageous. Nowhere in the text of the Restatement, or in the cases that Padwa relies upon, is there language stating that seemingly benign or privileged conduct will become outrageous by virtue of repetition alone. Rather, it is the totality of the circumstances that is determinative. *See Boyle,* 392 N.E.2d at 1055.

■ {22} We recognize that nonprivileged conduct that is "already at the edge of outrageous" may become actionable by virtue of its repetition. *See id.* at 1056. Under such circumstances, repetition may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability. *See id.* at 1055–56 (harassing telephone calls including one at a.m. after woman asked the defendant not to call her again because she had recently given birth to her child and been discharged from the hospital); *Muratore,* 656 F.Supp. at 480–82 (where the defendants repeatedly took the plaintiff's picture after she told them she did not want her photo taken, walked with her back to the photographers, covered her face and attempted to evade the photographers); *cf. Jones v. Clinton,* 990 F.Supp. 657, 677–78 (E.D.Ark.1998) (when questionable conduct is brief and isolated, and a defendant terminates the offensive sexual proposition upon being told to stop, such conduct, without more, will not rise to extreme and outrageous). *Muratore, Boyle,* and *Bartanus* involved situations in which the victim of the conduct did not give consent, and there were

**424**

no liberty interests of the defendants or third parties involved. *See Bartanus,* 480 A.2d at 1183 (where adults manipulated a child and prevented that child from having a meaningful relationship with his father); *Muratore,* 656 F.Supp. at 480–82; *Boyle,* 392 N.E.2d at 1056. Based upon all these differences, we do not find these three cases, and their common dependency on repetition, helpful or instructive, and they do not dissuade us from our holding in this opinion.

{23} Padwa also contends that Hadley's conduct was motivated in significant part by a malicious intent to injure Plaintiff after actual notice of the harm it would cause. Plaintiff argues that this tips the balance in favor of providing a remedy and outweighs the countervailing privacy interests that caution against recognizing a cause of action in this case. We disagree. "[L]iability does not flow from every act that intends to cause and does cause emotional distress." *Hakkila,* 112 N.M. at 176, 812 P.2d at 1324. Additionally, as we discuss below, the theory underlying prima facie tort is to provide a remedy for intentionally committed acts that do not fit within the contours of other well accepted torts. *See Schmitz v. Smentowski,* 109 N.M. 386, 396, 785 P.2d 726, 736 (1990). We will not allow Plaintiff to use prima facie tort to evade the stringent requirements of the tort of outrage. *See id.* at 398, 785 P.2d at 738.

*Padwa's Prima Facie Tort Claim*

{24} Padwa's complaint contains a claim for prima facie tort as an alternative to intentional infliction of emotional distress. "The theory underlying prima facie tort is that a party that intends to cause injury to another should be liable for that injury, if the conduct is generally culpable and not justifiable under the circumstances." *Schmitz,* 109 N.M. at 394, 785 P.2d at 734 (citing Restatement (Second) of Torts § 870 (1977)). The elements of a prima facie tort adopted by our Supreme Court in *Schmitz* are (1) an intentional, lawful act, (2) committed with the intent to injure the plaintiff, (3) causing injury to the plaintiff; and (4) the absence of justification for the injurious act. *See also* Rule 13–1631 NMRA 1999; *Kitchell v. Pub-*

*lic Serv. Co.,* 1998–NMSC–051, ¶ 15, 126 N.M. 525, 972 P.2d 344; *Silverman v. Progressive Broad., Inc.,* 1998–NMCA–107, ¶ 35, 125 N.M. 500, 964 P.2d 61; *Beavers v. Johnson Controls World Servs. Inc.,* 120 N.M. 343, 348, 901 P.2d 761, 766 (Ct.App.1995).

{25} If a defendant commits an otherwise lawful act with the intent to injure a plaintiff, as Padwa claims Hadley did in this case, then a court balances (1) the nature and seriousness of the harm to the plaintiff, (2) the interests promoted by the defendant's conduct, (3) the character of the means used by defendant, and (4) the defendant's motives. *See Schmitz,* 109 N.M. at 395, 785 P.2d at 735; *see also Kitchell,* 1998–NMSC–051, ¶ 15, 126 N.M. 525, 972 P.2d 344. The balancing of interests is a means of determining whether the conduct that the plaintiff complains of is subject to judicial relief as a prima facie tort. *See Beavers,* 120 N.M. at 349, 901 P.2d at 767. The balancing test is necessary because prima facie tort is not intended as a remedy for every intentionally caused harm; rather, it is a remedy for conduct intending to injure a plaintiff and without justification. *See Kitchell,* 1998–NMSC–051, ¶ 15, 126 N.M. 525, 972 P.2d 344; *Beavers,* 120 N.M. at 349, 901 P.2d at 767 (citing *Schmitz,* 109 N.M. at 394, 785 P.2d at 734).

{26} "The issue of justification, or excusability [of a defendant's conduct], focuses primarily on the question of whether the defendant's conduct was privileged." *Beavers,* 120 N.M. at 350, 901 P.2d at 768 (citing Restatement, *supra,* § 870 cmt. e). In this case, of course, Padwa cannot show under the facts alleged that Hadley acted without justification. Indeed we have just explained how the courts should not interfere with consenting adults with regard to their private affairs.

{27} Padwa has alleged conduct that does not rise to the level of extreme and outrageous behavior which cannot be the basis for recovery in tort for all the policy reasons previously discussed. Padwa would have us disregard the same policy and ignore the defects in Padwa's claim by, in effect, finding a substitute theory in prima facie tort. But prima facie tort "should not be used to evade stringent requirements of oth-

er established doctrines[.]" *See Schmitz*, 109 N.M. at 398, 785 P.2d at 738; *see also* Restatement, *supra*, § 870 cmt. j. We would turn prima facie tort on its head and ignore the caution of our previous opinions and those of the Supreme Court if we allowed Padwa to claim prima facie tort as an alternative to meeting the requirements of the tort of outrage. *See generally Kitchell*, 1998–NMSC–051, ¶ 15, 126 N.M. 525, 972 P.2d 344 (stating that prima facie tort is a limited remedy); *Lexington*, 1997–NMSC–043, ¶ 11, 123 N.M. 774, 945 P.2d 992 (emphasizing the importance of limiting the cause of action); *Silverman*, 1998–NMCA–107, ¶ 35, 125 N.M. 500, 964 P.2d 61 (articulating the elements necessary for a prima facie tort claim); *Beavers*, 120 N.M. at 348, 901 P.2d at 766 (noting that not every intentionally caused harm gives rise to a cause of action in prima facie tort). As such, Padwa's claim for prima facie tort fails as well.

## CONCLUSION

{28} We decline to extend the tort of outrage to situations involving the repeated pursuit of sexual relations between consenting adults. Hadley's participation in consensual sexual relations with adult women who had a past or present relationship with Padwa is not so extreme and outrageous as to permit Padwa to recover for intentional infliction of emotional distress. Additionally, Padwa does not state an independent claim for prima facie tort and cannot alternatively plead prima facie tort where he fails to meet the stringent requirements of the tort of outrage.

{29} **IT IS SO ORDERED.**

ALARID and APODACA, JJ., concur.