87 P.2d 437

**GUITERREZ v. GOBER, Police Judge.**

**No. 4431.**

Supreme Court of New Mexico.

Jan. 31, 1939.

Joseph L. Dailey, K. Gill Shaffer, and Waldo H. Rogers, all of Albuquerque, for appellant.

John F. Simms, Augustus T. Seymour, and Samuel Dazzo, all of Albuquerque, for appellee.

BICKLEY, Chief Justice.

Appellant was charged with violation of an ordinance of the City of Albuquerque, making the use of vile or abusive language a misdemeanor punishable by fine or imprisonment or both. No mention is made otherwise of the extent of the penalty, but no point is made that it is excessive or unduly severe. Appellant demanded of appellee a trial by jury in said cause. The demand being refused, and the appellee being about to put appellant on trial without a jury, appellant made application for mandamus to secure such claimed right. The matter was heard before Honorable David Chavez, Jr., designated to sit as district judge of Bernalillo County, who in a memorandum decision concluded that appellant was not entitled to the relief sought. Later, Judge Irwin S. Moise, upon further hearing in the absence of Judge Chavez, rendered judgment, denying the relief sought by appellant, dismissing the application for alternative writ of mandamus.

The appellee in his refusal of jury trial in the case relies in part upon Ch. 52, L. 1915, which is § 79-322, N.M.S.A.1929, as follows: "In all trials before justices of the peace for offenses within their jurisdiction the defendant may demand a jury, which shall consists of six jurors, to be summoned in the same manner as jurors in civil cases in justice courts, and said jury shall be empaneled and sworn, but nothing herein shall be held to authorize a jury in justice courts on preliminary examinations, nor in prosecutions under municipal ordinances."

This statute being enacted subsequent to the adoption of the Constitution of New Mexico, appellant says it is unconstitutional as denying the right of trial by jury in a case where it had existed prior to the adoption of the Constitution. Appellant cites Sec. 12 of Art. 2 thereof, which is as follows: "The right of trial by jury as it has heretofore existed shall be se-

cured to all and remain inviolate. In all cases triable in courts inferior to the district court the jury may consist of six. The legislature may provide that verdicts in civil cases may be rendered by less than a unanimous vote of the jury."

"'As it has heretofore existed,' of course, refers to the right as it existed in the territory of New Mexico at the time immediately preceding the adoption of the Constitution." Young v. Vail, 29 N.M. 324, 222 P. 912, 916, 34 A.L.R. 980. It is conceded by appellant that the provision quoted from our Constitution does not *confer* a right to trial by jury in all classes of cases but merely guarantees the continuance of the right of jury trial as it theretofore existed, citing 35 C.J., Juries, pages 148, 149. Appellant also quotes from the foregoing text as follows: "Violations of municipal ordinances belong to that class of minor offenses which were in general triable in a summary manner prior to the adoption of the several constitutions, and the denial of a jury trial in such cases is not a violation of the general constitutional provisions. Nor, by the weight of authority, are such cases within the special provisions of some of the constitutions which guarantee a jury trial in all criminal prosecutions; but the contrary has also been held. In some cases this rule has been held to apply even where the act constituting the violation of the ordinance is also indictable as a public offense, the decisions being based upon the ground that the offense against the municipality is distinct and separate from that against the state;

but other cases, while conceding that a summary trial may be had where the offense is against a mere municipal regulation, hold that if it is also an indictable offense at commonlaw or under the penal laws of the state a jury trial cannot be denied. By statute, or special charter provision the right to a jury trial in this class of cases is sometimes expressly conferred." 35 C.J. § 97, p. 192.

Appellant says in his brief: "As stated in the authorities above set out, the question of whether trial by jury in case of violation of a municipal ordinance may be determined by whether or not the *right* was *granted by statute* existing at the time of the adoption of the Constitutional provision that provides the right of trial by jury as it had theretofore existed." (Emphasis ours.) And see McQuillen, Municipal Corporations, 2d.Ed., Vol. 3, § 1163, for the following:

"The right of trial by jury existed in England and was formally declared as a right by Magna Charta, but municipal corporations in that country, prior and subsequent to that declaration, enforced their by-laws by pecuniary penalties in a summary manner; and like summary jurisdiction was constantly exercised in this country; therefore, it has become an established doctrine that, the right of trial by jury is understood to apply alone to those cases or class of cases wherein the right existed under the prevailing rules of the common law, usually embracing only offenses against public laws general in their

nature—in England, made penal throughout the realm, and in this country, penal throughout the state—because of their intrinsically criminal character, or, because made criminal by statute.

"Under the prevailing judicial view the usual constitutional provisions relating to this subject are not considered as designed to extend the right of trial by jury, but are regarded as confirming and securing it as it was understood at common law. Generally, such provisions have no reference whatever to the violation of local by-laws and ordinances made for the internal police and good government of the locality. The penalties permitted to be inflicted are nearly always trivial in character; 'and the reason advanced as to why the trials under ordinances can be conducted without a jury, and without violating the constitutional guaranty is, that the constitutional provision does not extend the right, but merely secures it in the cases in which it was a matter of right before the adoption of the constitution. Such trials were conducted generally without juries prior to the adoption of our constitution, and consequently, do not fall within the constitutional guaranty.'"

Article 3, Sec. 2, clause 3, of the United States Constitution, U.S.C.A. provides: "The Trial of *all* Crimes, except in Cases of Impeachment, shall be by Jury; * *." (Emphasis ours.)

The Sixth Amendment declares that: "In *all* criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, * * *." (Emphasis ours.)

In the Bill of Rights for New Mexico, as declared by General Stephen W. Kearney, on September 22, 1846, it is provided: "Fifth: The right of trial by jury shall remain inviolate." That was merely to say that the inhabitants of the conquered territory were entitled to the protection of the Constitution of the United States. This guaranty was repeated by the Territorial legislature in the Act of the 12th of July, 1851, Laws 1851–52, p. 144. On the same day the legislature declared: "In criminal cases, the common law, as recognized by the United States and the several states of the union, shall be the rule of practice and decision." See § 34-102, N. M.S.A.1929.

In Beals v. Ares, 25 N.M. 459, 185 P. 780, it was said [page 788]: "* * * The common law, upon its adoption, came in and filled every crevice, nook, and corner in our jurisprudence where it had not been stayed or supplanted by statutory enactment, in so far as it was applicable to our conditions and circumstances."

In 39 Harvard Law Review, June 1926, appears an article by Felix Frankfurter and Thomas G. Corcoran, entitled "Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury." Since these learned law writers suggest that the claims of history in a case presenting the problem under discussion should weigh heavily "and that a page of history is worth a volume of

logic", we venture a quotation from the page of history cited:

"* * * A mass of prohibitions against petty *disorders, swearing,* drunkenness, embezzlement, wage-bargainings and the like, led to frequent grant of this summary power to the justices. This process of nibbling away the traditional procedure was gradually applied to offenses of greater moment. After the Restoration, by the first Excise Acts and regulations of trade, and then by the Game Acts of Charles II, the practice insensibly became characteristic of the jurisprudence of the country. Under the dominating pressure of a practical problem in the enforcement of law it had become common practice for Parliament to except new offenses from the protection of jury procedure. And so, successive companies of colonists carried with them a conception of the scope of trial by jury which dispensed with it in cases that doubtless touched the average Englishman's experience more than any other part of the criminal law.

"Down to the separation of the colonies from the mother country this summary jurisdiction of the English magistrates had three salient features. (1) There was a specific withdrawal from trial by jury of specific offenses in specific statutes, rather than a general formula for summary procedure. (2) There was no unifying consideration as to the type of criminal offense subjected to summary trial nor any uniformity in the number of magistrates before whom the various offenses were tried.

Although the great majority of instances were aptly characterized as 'petty' violations, some bordered closely on serious felonies and were punished with appropriate severity. The controlling factor seems less the intrinsic gravity of the offense, judged by its danger to the community, than the desire for a swift and convenient remedy. (3) Nor was there uniformity about appeals. The earlier statutes gave no appeal. Beginning with Charles II the more serious offenses, excepting infractions of excise laws, could be retried by the justices in Sessions sitting without a jury. But this was largely a paper privilege, for offenders with purses long enough to afford a retrial were few.

"The most striking aspect of these summary trials without juries at common law was the great volume of offenses thus treated. A paging of the 1776 edition of Burn's *Justice of the Peace* reveals the far-reaching scope and importance of resort to trial without jury in the *criminal law* of the time. Eliminating all penal enforcements in which the informer or the 'party aggrieved' shared the fine with the Crown, we find at least one hundred offenses for which the Crown prosecuted before a justice and without a jury. Violations of the laws relating to liquor, trade and manufacture, labor, smuggling, traffic on the highway, the Sabbath, 'cheats,' gambling, *swearing,* small thefts, assaults, offenses to property, servants and seamen, vagabondage, and *disorderly conduct* were largely in the justices' hands. If we add *qui tam* prosecutions

which in earlier days preceding the modern system of public prosecution were hardly distinguishable from regular *state proceedings,* there are at least a hundred more within the jurisdiction of the unaided justices. Nearly two thousand closely-packed pages of Burn's *Justice* are devoted largely to the law of this summary jurisdiction. Bacon's *Abridgement* in 1768 thus epitomizes the power of the justices over 'inferior offenses': 'The Jurisdiction herein given to Justices of Peace by particular Statutes is so various, and extends to such a Multiplicity of Cases, that it were endless to endeavor to enumerate them.' And Blackstone, writing in 1769, after enumerating a few of the more recurring offenses dealt with summarily, refers the student to the justice-books for 'a vast variety of others.' ('Another branch of summary proceedings is that before justices of the peace, in order to inflict divers petty pecuniary mulcts and corporal penalties denounced by act of parliament for many disorderly offences, such as common swearing, drunkenness, vagrancy, idleness, and a vast variety of others, for which I must refer the student to the justice-books formerly cited.' 4 Blackstone Comm. 281) These various acts do not in terms eliminate the jury. But the sense of the legislation is clear and the practice undisputed. *Authority given to the justices meant 'the justices' and not 'the justices and jury.'* The great justice-book, which gathered up the accumulated practice under the statutes is explicit that they eliminated jury trial. In his classic Dr. Rich-

ard Burn, himself a 'J.P.' for Westmoreland and Cumberland, thus summarized the result: 'The power of a justice of the peace is in restraint of the common law, and in abundance of instances is a tacit repeal of that famous clause in the great charter, that a man shall be tried by his equals.' 'In these,' says Blackstone, relying on Lambard and Burn, 'there is no intervention of a jury, but the party accused is acquitted or condemned by the suffrage of such person only as the statute has appointed for his judge.'

"The volume of the offenses thus apparently withdrawn from the requirement of popular trials gains added significance from the frequent severity of the penalties summarily enforced. To be sure, the majority of penalties are proportioned to the minor quality of the offenses which they punish. The miscreant who abstained from church on the sabbath day paid one shilling to the use of the pious poor; the individual who tippled long at the alehouse was amerced only three shillings fourpence and in default of payment had to sober up for four hours in the stocks; while the innkeeper who profited from the tippling was fined ten shillings and jailed until he paid. But the scale of fines rose rapidly. The tollkeeper who sold ale at his bridge and held up the traffic was mulcted five pounds. The eighteenth century bootlegger who 'hawked, sold or exposed for sale any spirituous liquors about the streets, highways or fields in any wheelbarrow or basket' or 'dispensed' it 'on the water in any boat or in any other man-

ner' was fined ten pounds to the use of the church warden. He who distilled secretly paid fifty pounds when his secret was out. Bribery of an excise officer subjected the offender to a penalty of five hundred pounds, with confinement at hard labor until paid. Burn's list of offenses prosecuted through the magistrates discloses at least seven with twenty pounds penalty, three with fifty pounds, one with one hundred pounds, and one with five hundred pounds. Qui tam recoveries were also heavy. At least eight offenses were penalized at twenty pounds, one at twenty-five pounds, five at fifty pounds, two at two hundred pounds, and one at five hundred pounds. Bearing in mind changes in money values, we get some measure of the outside limits of punishment which the common law, as a matter of routine procedure enforced through magistrates, coincident with its regard for the system of jury trial.

"Nor did successive Parliaments shrink from the infliction of corporal punishment or imprisonment and hard labor for such offenses. The 'common player of interludes who should perform or cause to be acted any interlude, tragedy, opera, play farce or other entertainment' was likely to be taken up as a vagabond and soundly whipped by the local justice before commitment to the house of correction, pending the Sessions. The smuggler's wharfhands, the keeper of the gaming house, the unmarried mother 'offending eftsoons again' might be committed indefinitely unless heavy surety were forthcoming for their indefinite good behavior. The rum runner's scout caught waiting the arrival from sea of illicit goods, suffered a month at hard labor, with severe whippings occasionally added; the gamekeeper who poached on the side risked three months in jail; the dissenting preacher who had not taken the oath of allegiance, six months. The false prophet who 'advanced any fond fanatical or false prophecy to the disturbance of the realm,' the unmarried mother, the lottery agent, the servant assaulting his master, the destroyer of bent grass were incarcerated for a year.

"Thus drastically limited does the right of trial by jury seem to have been known to Englishmen for *two centuries* preceding the separation of the colonies. Alongside of trial before the popular tribunal was trial by magistrates. *There were crimes and crimes.* The great dividing line was the use of a jury. The settled practice in which the founders of the American colonies grew up reserved for the justices innumerable cases in which the balance of social convenience, as expressed in legislation, insisted that proceedings be concluded speedily and inexpensively. Blackstone, high priest of the obsolete common law, however much he deplored the growth of this practice and its tendency to throw into disuse the ancient court leet and the sheriff's tourn, recognized its prevailing scope. Nor was this state of the law at the time of the outbreak of the Revolution, a mushroom growth since the period of colonization, or a pet project of George III. Of

the statutes conferring summary jurisdiction, which the 1776 edition of Burn's *Justice* records, all but twenty-four antedate George III, two come from Richard II's time, eight from Elizabeth, twelve from James I, four from Charles I, twelve from Charles II, five from William III, four from Anne, seven from George I, and twenty-two from George II. Of the qui tam prosecutions without jury, only thirteen are the product of George III's reign, and at least ten antedate 1700.

"The limited part played by jury trials in *criminal cases* at the time of the separation of the colonies has, in essentials, continued in England to the present. As the complexities of modern life have swept conduct increasingly under legal control, legislation has extended the field of summary jurisdiction and modern procedural codes have perfected the exercise of this authority. Thus, the old power of a single magistrate to sit when and where he could be found has been almost entirely transferred to petty Sessions of two justices of the peace sitting regularly in an appointed courthouse. The range and severity of punishment in summary trials has been defined by limiting jurisdiction to the imposition of fines up to a hundred pounds and sentences with hard labor up to six months. Furthermore, in all cases other than assault involving imprisonment for more than three months, the accused may claim trial by jury. Within these limits, however, the criminal legislation of England proscribes at least three hundred and fifty offenses the

enforcement of which is in the exclusive keeping of the magistrates. And this list includes an English analogue for practically every one of those minor offenses the prosecution of which constitutes such new sources of voluminous jurisdiction for the United States district courts.

"The colonial charters guaranteed settlers the liberties and immunities of Englishmen and defined legislative power by the laws of England. The newcomers brought with them the legal traditions of James I, of which summary jurisdiction by justices of the peace was a familiar part. Then followed the task of adapting English law to American soil; the old material had to be transformed, not merely transplanted. This was true of the colonial law concerning the powers of magistrates. The colonies did not blindly reproduce English procedure. Primitive settlements across the sea furnished no provocation for conferring magisterial powers upon a justice of the peace similar to the complexities of the elaborate criminal statutes and the centralizing tendencies of the Stuarts. The need for criminal legislation in the colonies was comparatively narrow; and their sparsely settled, homogeneous societies were peculiarly adapted for dealing with wrongdoers through popular forms of justice. Inevitably, therefore, the colonies entrusted fewer matters to justices than did the contemporary English law. Inevitably, also, the English magistrates exercised wider powers of punishment than the colonies gave to their magistrates.

Colonial law reflected a low economic level. Land-poor settlers could not pay large fines; man-poor communities were not likely to keep producers under long jail sentence.

"Nor did the colonies work out uniform rules among themselves. The law of magisterial power in New York, in 1776, was no more exactly like that of Massachusetts, or of South Carolina, than it was exactly like that of England. Different environments evolved different applications of trial by jury and its limits. The isolation of the scattered communities, differences in the composition of their settlers, the paucity of trained lawyers, fostered in each colony distinctive features of a common system.

"Despite these differences, all the colonies, to some extent at least, re-lived the experience of the mother country, and resorted to summary jurisdiction for minor offenses with full loyalty to their conception of the Englishman's right to trial by jury. * * *

"After these and like allowances are made in interpreting the colonial material, two results are overwhelmingly established: first, that all the colonies whose records have been examined, acted on the conviction that the much-cherished jury procedure was not imperative for *small offenses;* secondly, that the practice of summary procedure, pursued in varying measure by the different colonies, persisted unchallenged through the acrimonious controversy with the Crown over the denial of the jury in admiralty courts, through the framing of the jury clauses in state constitutions, and through the enactment of the jury clauses in the Federal Constitution." (Emphasis ours.)

In District of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 848, it was decided:

"The offense of engaging, without a license, in the business of a dealer in second-hand personal property, defined by the Code of the District of Columbia, punishable by a fine of not more than $300 or imprisonment of not more than 90 days, is to be classed as a petty offense which, consistently with Art. III, § 2, cl. 3, of the Constitution [U.S.C.A.], may be tried without a jury.

"In determining whether an offense is a petty offense that constitutionally may be tried without a jury, the severity of the penalty inflictable, as well as the moral quality of the act and its relation to common law crimes, should be considered.

"Engaging in the business of selling second-hand property without a license was not indictable at common law. Today it is at most but an infringement of local police regulations, and its moral quality is relatively inoffensive.

"In England and in the American States, at the time of the adoption of the Constitution, confinement for a period of 90 days or more was not an unusual punishment for petty offenses, tried without a jury."

■ In view of the foregoing considerations, we conclude that the offense with which the appellant is charged is a petty offense, such as was at the common law tried summarily without a jury.

Our next inquiry is whether the common law as known in the United States and the several states of the Union, which as we have seen did not secure the right of trial by jury in every criminal proceeding, and which permitted petty offenses to be prosecuted in a summary manner without a jury trial, has been abrogated or supplanted by some statute of New Mexico enacted after the adoption of the common law in 1851, and remaining in effect until the adoption of the Constitution of New Mexico.

Appellant's best reliance is upon Sec. 79-321, N.M.S.A.1929, which was enacted Jan. 13, 1876, and which is as follows: "In all cases before justices of the peace, wherein the justice has original jurisdiction, the defendant shall not be deprived of the right of a trial by jury."

■ No part of the Act of which the foregoing is a part purports expressly to repeal, amend or modify the 1851 Act, which adopted the common law, and our attention has not been called to any statute which purports to expressly abrogate the applicable common law rule. If the statute last quoted may be held to have such a drastic effect, it must be by implication only. Repeals by implication are not favored. In 35 R.C.L., Statutes, § 280, it is said: "It is not to be presumed that the legislature intended to abrogate or modify a rule of the common law by the enactment of a statute upon the same subject; it is rather to be presumed that no change in the common law was intended, unless the language employed clearly indicates such an intention. It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language. In order to hold that a statute has abrogated common law rights existing at the date of its enactment, it must clearly appear that they are so repugnant to the act, or the part thereof invoked, that their survival would in effect deprive it of its efficacy and render its provisions nugatory."

Ch. 27, L.1875–76, was entitled: "An Act to define the qualifications, powers and jurisdiction of justices of the peace; and regulating the practice in their courts." It contains 124 sections. Section 5 defines the civil and criminal jurisdiction of justices of the peace. A portion of said Sec. 5 is as follows:

"That every justice of the peace shall have jurisdiction co-extensive with the county for which he is (was) elected:

"1st, In all civil actions when the debt, balance due or damages, shall not exceed

one hundred dollars, except in actions for slander, libel and false imprisonment, or where the title or boundary of lands shall come in question.

"2d, To cause to be kept all laws made for the preservation of the peace.

"3d, To cause to come before him, persons who shall break the peace, and commit to jail or bail them as the case may be.

"4th, To arrest all persons who attempt to break the peace, and compel them to give security for their good behavior and to keep the peace.

"5th, To cause to be arrested and brought before him all persons charged with an offence against any of the laws of the Territory and commit them to jail, or take bond for their appearance before the district court, at the next term thereof in the county, as the case may require.

"6th, In all cases of larceny and receiving stolen goods, when the value of the goods stolen or received does not exceed twenty dollars.

"7th, In all cases of common assault, assault and battery, affray, and disturbing religious congregation or public meetings.

"8th, In all cases of malicious mischief or injury, where the damage done, does not exceed one hundred dollars.

"9th, In all cases of the unlawful carrying of concealed weapons.

"10, In all cases of unlawful altering of weights and measures, or using false weights and measures.

"11th, In all other offences defined in this act."

The remainder of said Sec. 5 refers to the jurisdiction of justices of the peace in the matter of punishment for offenses.

Sec. 80 of the Act also refers to jurisdiction in criminal cases, a portion thereof being as follows: "Every justice of the peace shall have jurisdiction in criminal cases throughout the county in which he was elected and where he shall reside, and shall be a conservator of the peace therein. He is authorized and required, on view or complaint made on oath or affirmation, to cause any person charged with the commission of a crime or breach of the law to be brought before him or some other justice of the peace, and shall enquire into the complaint, and try the same, if within the jurisdiction of a justice of the peace, as defined in this act, and either commit to jail, discharge or recognize such person, to appear before the district court, as the case may require. * * *"

As pointed out by Mr. Frankfurter and Mr. Corcoran in the article quoted supra, "Authority given to the justices meant 'the justices' and not 'the justices and jury' ".

The legislature in that Act, so far as criminal cases are concerned, did not in

express terms eliminate the jury; neither did they enjoin or command it. They were familiar with the institution of jury trial in criminal cases, the details of which because of their familiarity were taken for granted and not defined. They had previously said that the right to trial by jury should remain inviolate, and simultaneously had adopted the common law as the rule of practice and decision in criminal cases. This was definition enough. So when they wrote Sec. 11, "That in all cases before justices of the peace, wherein the justice has original jurisdiction, the defendant shall not be deprived of the right of a trial by jury," they again embodied the guaranty of jury trial in criminal cases, which is almost universally considered to be a guaranty subject to the appropriate scope of summary prosecution for petty or minor offenses.

Of singular interest at this point is a quotation from a leading Pennsylvania case, Byers v. Commonwealth, 1862, 42 Pa. 89. The court enforced the petty crime doctrine in the face of the constitutional guaranty of jury trial in all criminal prosecutions, saying: "The founders of this state brought with them to their new abode the usages to which they had been accustomed in the land from which they emigrated. Among them was trial by jury. That mode of trial had long been considered the right of every Englishman, and it had come to be regarded as a right too sacred to be surrendered or taken away * * * in bringing it with them the founders of the Commonwealth doubtless intended to bring it as they had enjoyed it. * * * No intention to enlarge it appears in the laws agreed upon in England in 1682. * * * All looked to preservation, not extension. * * * What, then, was this right thus cherished and thus perpetuated? * * * It was a right the title to which is founded upon usage, and its measure is therefore to be sought in the usages which prevailed at the time when it was asserted. * * * Summary convictions for petty offences against statutes were always sustained, and they were never supposed to be in conflict with the common law right to a trial by jury. The ancient as well as the modern British statutes at large are full of Acts of Parliament authorizing such convictions."

Appellant puts great reliance upon the word *all* in the phrase "in all cases before justices of the peace" employed in the 1876 Act, quoted supra. It is to be noted from a reading of Ch. 27, L. 1875–76, that the first ten sections of the Act, together with Sec. 80, relate to jurisdiction, practice and procedure in criminal prosecutions and contempt proceedings. Section 11, heretofore quoted, is sandwiched in between these provisions, and the remainder of the Act, which deals with procedure in civil cases, employs over one hundred sections pertaining to the details of summons, set-off, execution, replevin, attachment, change of venue, in civil actions, forcible entry and detainer, etc. Appearing among the provisions relating to civil cases is Sec.

36, which provides: "In every action brought by virtue of this act, it shall be lawful for either of the parties to the suit, or for the attorney or agent or either of them, after issue joined, but before the court shall proceed to inquire into the merits of the cause, to demand of the court that their cause be tried by a jury; said jury to consist of six men possessing the same qualifications as jurors in the district court. * * *"

■ If Section 11, which immediately follows the provisions relating to criminal prosecutions, by the use of the word "all" was intended to confer a right to jury trial in civil cases, it would not have been necessary to have enacted Section 36, quoted supra. Appellee concedes that the wording of Section 36 expressly gives the right of jury trial in civil cases. We assume such to be the case, and shall have occasion later to compare the language there employed with the language used in Ch. 52, L. 1915. So we are unable to agree with counsel for appellant that Sec. 11, by virtue of the use of the word "all" is "general and all-encompassing." We think its application should be restricted to what immediately preceded it. It would not be inconsistent, however, to assert that Sec. 11 was merely intended to preserve the right to a jury trial in all cases in which such right theretofore existed, and that Sec. 36 was employed out of an abundance of caution to extend the right to trial by jury in civil cases to "every action brought by virtue of this act" whether it existed theretofore or not.

As we have seen, the Supreme Court in District of Columbia v. Clawans, supra, held that the Sixth Amendment, U.S.C.A. Const., which declares that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury, * * *" in the light of historical considerations, does not mean that the accused is entitled to a jury where he is brought to trial for the commission of a petty federal offense of the petty offense class as theretofore understood. It was not thought necessary to give the word "all" its literal meaning, and it was not considered as "all-encompassing" in the light of historical considerations.

In a comment on the decision in State Board of Medical Examiners v. Buettel, 102 N.J.L. 74, 131 A. 89, the Illinois Law Review, Vol. 20, at page 834, says that a good statement is: "That the constitutions do not secure a right to a jury trial in cases of the same sort as those in which the common law dispensed with a jury."

The trial court in an opinion filed in the case took the view that Ch. 52, Sess.Laws 1915, which is § 79-322, N.M.S.A.1929, is in a measure interpretative of the law as it theretofore existed. We agree with this view.

The 1915 enactment ·is consistent with the view that the legislature believed that under existing laws in trials before justices of the peace for offenses within their jurisdiction, a jury trial could not be demanded by the defendant as of right in prosecutions for offenses of a petty or minor nature because jury trial in that sort of case

had been dispensed with by the common law. The 1915 Act seems designed to confer a right thought not theretofore to exist. If the view of appellee heretofore referred to, that the language of Sec. 36 of Ch. 27, L.1875-76, is appropriate to *confer* the right of jury trial in civil cases, then it would seem that the language of the 1915 Act: "In all trials before justices of the peace for offenses within their jurisdiction the defendant may demand a jury, which shall consist of six jurors, to be summoned in the same manner as jurors in civil cases in justice courts, and said jury *shall* be empaneled and sworn" (emphasis ours), is appropriate to confer upon the accused the right to a jury trial whether it theretofore existed at the common law or not, subject to the exception. Furthermore, it is to be noted that the remaining language of the section provides: "But nothing herein shall be held to authorize a jury in justice courts on preliminary examinations, nor in prosecutions under municipal ordinances." This is not an affirmative declaration that justices of the peace may proceed summarily without a jury in prosecutions under municipal ordinances, but rather a recognition of the fact that they theretofore had the power to proceed in that manner. It is not unlikely that in 1915, which was shortly after the adoption of our Constitution, the policy of the prosecution of offenses within the jurisdiction of justices of the peace with or without a jury came forward for consideration by the Bench and Bar and the legislators. It seems reasonable that they may have been of the opinion that

under the common law practice petty offenses could be prosecuted in justice of the peace courts without trial by jury and that this rule had not been changed by any statutes of the Territory of New Mexico. While it is doubtless true that the greater number of petty offenses arose from the violation of municipal ordinances, there were other offenses of a petty nature arising from the violation of state or territorial statutes. There was no recognized mechanical line of demarcation between petty offenses arising from the violation of municipal ordinances and those arising from the violation of general statutes. Apparently the 1915 legislature adopted this mechanical division and conferred the right of jury trial for offenses within their jurisdiction even though the common law had dispensed with a jury in the trial of *some* such offenses, namely, petty offenses, arising from violations of enactments other than municipal ordinances, but that the legislature was cautious not to disturb the existing common law practice of summary prosecutions without a jury in cases arising from the violation of city ordinances.

As trial judge Chavez well said in his opinion, whether or not the legislature had the power to limit the jury to six men in criminal trials is beside the question here.

Whether the violation of any and all municipal ordinances may fall within the class of offenses usually denominated "petty" or "minor", it is not necessary now to decide. When so called upon, the nature of the offense and the severity of the penalty pre-

scribed will doubtless be elements to be considered.

That appellee had jurisdiction as justice of the peace to try offenses consisting of the violation of municipal ordinances appears from Sec. 90-910, N.M.S.A.1929.

From all of the foregoing, we conclude that the district court was not in error in holding that Sec. 79-322, N.M.S.A. 1929, withstands the attack made upon it.

Finding no error in the judgment, it is affirmed and the cause remanded, and it is so ordered.

BRICE, ZINN, and SADLER, JJ., concur.

MABRY, J., did not participate.