**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2017-NMCA-024

Filing Date: November 28, 2016

Docket No. 34,429

ARNOLDO CARRILLO and SANTA FE
HORSE RACING BY CARRILLO'S, LLC,
a domestic limited liability company,

      Plaintiffs-Appellants,

v.

MY WAY HOLDINGS, LLC, a foreign
limited liability company d/b/a
SUNLAND PARK RACETRACK
AND CASINO; SUNRAY GAMING OF
NEW MEXICO, LLC, a domestic
limited liability company; ZIA PARK,
LLC, a foreign limited liability company;
RUIDOSO DOWNS RACING, INC., a
domestic corporation; RICK BAUGH;
LONNIE S. BARBER, JR.; SHAUN
HUBBARD,

      Defendants-Appellees,

and

VINCE MARES in his official capacity as
DIRECTOR OF THE NEW MEXICO
RACING COMMISSION, SUNLAND PARK
BOARD OF STEWARDS, ZIA PARK BOARD
OF STEWARDS, SUNRAY PARK BOARD
OF STEWARDS, RUIDOSO DOWNS
BOARD OF STEWARDS,

      Defendants.

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
T. Glenn Ellington, District Judge

1

Graeser & McQueen, LLC
Christopher L. Graeser
Santa Fe, NM

for Appellant

Keleher & McLeod, P.A.
Deron B. Knoner
Nathan S. Stimson
Thomas C. Bird
Albuquerque, NM

for Appellees My Way Holdings, LLC and Rick Baugh

Civerolo, Gralow, Hill & Curtis
Megan Day Hill
Albuquerque, NM

for Appellees SunRay Gaming of New Mexico, LLC and Lonnie S. Barber, Jr.

Conklin, Woodcock & Ziegler, P.C.
John K. Ziegler
Traci N. Olivas
Albuquerque, NM

for Appellees Ruidoso Downs Racing, Inc. and Shaun Hubbard

Billy R. Blackburn
Paul Linnenburger
Albuquerque, NM

for Appellees Zia Park, LLC and Rick Baugh

## OPINION

**KENNEDY, Judge.**

**{1}** Arnoldo Carrillo is a racehorse owner and trainer who, along with his business Santa Fe Horse Racing by Carrillo's, LLC (collectively Carrillo), are licensed with the New Mexico Racing Commission (the Commission). Between September 2012 and April 2013 one of Carrillo's horses died as a result of racing activities and three others suffered race-related injuries—one so severe that it had to be euthanized. As a result, four of the five privately owned, licensed racetracks in New Mexico excluded Carrillo from entering their tracks and the races held at their tracks. Carrillo filed suit against the racetracks, the

2

managers of the racetracks, the Board of Stewards for each racetrack, and the Commission, alleging his rights as a licensee were violated by his exclusion. The racetracks filed motions for summary judgment, asserting that they had a common law right to exclude both patrons and licensees alike from their property. Carrillo did not dispute the facts set forth in the racetracks' motions. Instead, he argued that the racetracks possessed an unfettered right to exclude patrons but not licensees. On appeal, the parties make much the same argument.

**{2}** We conclude that racetracks in New Mexico possess a common law right to exclude any person—patron or licensee—for any reason other than those specified in the New Mexico Human Rights Act. Though we do not decide here whether these racetracks hold a monopoly over racing in New Mexico, we do hold that where the facts of the case suggest that there may be a monopoly control over the racing business, a racetrack seeking to exercise its common law right must make a showing that it has a legitimate justification for doing so; exclusion or ejection may not be done arbitrarily or without explanation. We conclude that the district court properly applied this common law right in this case and affirm its order granting summary judgment as to the racetracks.

## I. BACKGROUND

**{3}** The facts of this case are not in dispute. Carrillo is licensed with the New Mexico Racing Commission to train and race horses. On September 9, 2012, two horses—both of which belonged to Carrillo—were injured while racing at Zia Park[1] and had to be removed by ambulance. Carrillo's horses were the only two horses injured at Zia Park on that date. On October 29, 2012, another of Carrillo's horses suffered an injury at Zia Park and had to be euthanized. That same day, Zia Park informed Carrillo that he was excluded from the premises and that he was no longer welcome to race there; Carrillo was escorted from the premises.

**{4}** On April 12, 2013, Carrillo's horse died immediately after winning a race at Sunland Park.[2] The next day, on April 13, 2013, Sunland Park informed Carrillo in writing that, because of the death of his horse at Sunland Park as well as his "record at New Mexico tracks," he was excluded from the property and any races held there. He was also informed

---

[1]Zia Park is owned by Appellee Zia Park, LLC. Rick Baugh was the assistant general manager at Zia Park when Carrillo was excluded.

[2]Sunland Park Racetrack & Casino (Sunland Park) is owned by My Way Holdings, LLC. Rick Baugh was the general manager at Sunland Park when Carrillo was excluded.

that the horse's death was under investigation.[3] Likewise, on April 17, 2013, SunRay Park[4] informed Carrillo that, due to his horse's death at Sunland Park and the accompanying investigation, he was being denied entry to the property and any race held there. As a result, Carrillo's horses that were entered for subsequent races on April 19 and April 21 were scratched.

**{5}** Carrillo attempted to enter a horse at the Ruidoso Downs[5] on July 6, 2013. Upon speaking to management, however, Carrillo was told that he was being excluded from the track. On July 12, 2013, Carrillo received a letter stating that because of the number of "incidents" and his "record at New Mexico tracks," Carrillo was being denied entry to the Ruidoso Downs property as well as entry into any live racing at that facility.

**{6}** On August 5, 2013, Carrillo filed a complaint against Zia, Sunland, SunRay, and Ruidoso in the district court.[6] Carrillo's complaint brought claims for injunctive relief, declaratory judgment, interference with prospective contractual relations, prima facie tort, and negligence. Sunland, SunRay, Ruidoso, and Zia (collectively, the racetracks) filed motions for summary judgment. Carrillo filed a response to each, asserting that the reasons given for his exclusion were inadequate, that the common law right to exclude gives racetracks unfettered discretion only to exclude patrons who are not in possession of a license from the Commission, and that the regulation governing exclusion also reflects a difference between the right to exclude patrons and the right to exclude licensees.

**{7}** The district court held a hearing on the motions, during which Carrillo conceded that the district court would likely grant the summary judgment motions, "on the grounds that, as a matter of law, the associations retain the common law right to exclude licensees." In its order, the district court found that no genuine issues of material fact existed in the case. It reasoned that under the common law, a racetrack owner has a right to exclude any person for any lawful reason, and that right has been "affirmed by regulation at 15.2.2.8(V) NMAC and codified by statute at NMSA 1978, Section 60-1A-28.1 (2014)." As a result, the district

---

[3]According to the results of that investigation, the horse died of a pulmonary hemorrhage. Although Zia alleged that Carrillo's horses had been treated with drugs used to mask injury, no evidence of those drugs exists in the record before the district court.

[4]SunRay Park & Casino (SunRay Park) is owned by SunRay Gaming of New Mexico, Inc. Lonnie S. Barber, Jr. was the director of racing operations at SunRay Park when Carrillo was excluded.

[5]Ruidoso Downs Race Track is owned by Ruidoso Downs Racing, Inc.

[6]Carrillo also brought claims against the Board of Stewards for each of these racetracks, as well as against the Commission. Those claims were not subject to summary judgment and are not part of this appeal.

court granted the summary judgment motions and dismissed Carrillo's claims.[7] Carrillo timely appealed.

## II.   DISCUSSION

**{8}**     On appeal, Carrillo argues that Section 60-1A-28.1 controls the outcome of this case. Carrillo suggests that Section 60-1A-28.1 represents a modification to the common law rule that racetracks can exclude anyone, and instead creates a distinct set of requirements for a racetrack to satisfy in order to exclude licensees[8] from their premises. Alternatively, Carrillo argues that the common law right to exclude does not support the district court's decision to grant summary judgment. Finally, Carrillo argues that 15.2.2.8(V) NMAC is not relevant to the outcome of this appeal because it is derivative in nature and merely reflects the common law or Section 60-1A-28.1. Underlying Carrillo's argument is the suggestion that Zia, Sunland, SunRay, and Ruidoso did not afford him the due process considerations that he was entitled to before his exclusion from their tracks. Carrillo does not, however, explain why the privately owned racetracks involved in this case were obligated to comply with due process, other than suggesting that these racetracks are part of a quasi-monopoly.

### A.     Section 60-1A-28.1 Does Not Apply to This Case

**{9}**     Section 60-1A-28.1 was made effective March 3, 2014. *See id.*; 2014 N.M. Laws, ch. 6, § 1. Carrillo had filed his complaint in district court on August 5, 2013. The racetracks point out that Section 60-1A-28.1 cannot be applied in this case because it was enacted after Carrillo had already been excluded from the racetracks in question and had filed his complaint. Carrillo argues that because his exclusion from the racetracks in question is ongoing, Section 60-1A-28.1 is dispositive if the racetracks "do not have a current right to exclude" under the statute. Carrillo does not, however, cite any authority to support this assertion. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("Issues raised in appellate briefs which are unsupported by cited authority will not be reviewed by us on appeal."). Carrillo also does not explain how or why we might apply Section 60-1A-28.1 retroactively. We agree with the racetracks and conclude that Section 60-1A-28.1 is not available for the disposition of the case before us.

---

[7]Notably, Carrillo does not make any assertion of error in the district court's decision to move forward on the summary judgment motion prior to the completion of discovery. The rule that a court generally should not grant summary judgment before discovery is complete is not absolute. *See Sun Country Sav. Bank of N.M., F.S.B. v. McDowell*, 1989-NMSC-043, ¶ 27, 108 N.M. 528, 775 P.2d 730.

[8]The term "licensees" as used throughout this opinion refers to occupational licensees, namely trainers, owners, jockeys, etc., who hold a license from the Commission to engage in racing or a regulated activity, but excludes the racetrack owners themselves.

**{10}** With regard to retroactivity, Article IV, Section 34 of the New Mexico Constitution provides that "[n]o act of the [L]egislature shall affect the right or remedy of either party, or change the rules of evidence or procedure, in any pending case." We review de novo the applicability of this section of the Constitution. *See Hyden v. N.M. Human Servs. Dep't*, 2000-NMCA-002, ¶ 12, 128 N.M. 423, 993 P.2d 740. A case is considered "pending" under Article IV, Section 34 once it is filed, or where the district court retains jurisdiction, and the case is no longer pending once a final decision is entered and the court no longer has jurisdiction. *See Starko, Inc. v. Cimarron Health Plan, Inc.*, 2005-NMCA-040, ¶ 9, 137 N.M. 310, 110 P.3d 526. It is therefore clear that, for purposes of Article IV, Section 34, this was a "pending case" when Section 60-1A-28.1 was enacted.

**{11}** Article IV, Section 34 goes hand in hand with the rule that "statutes are presumed to operate prospectively only and will not be given a retroactive effect unless such intention on the part of the Legislature is clearly apparent." *Bradbury & Stamm Constr. Co. v. Bureau of Revenue*, 1962-NMSC-078, ¶ 40, 70 N.M. 226, 372 P.2d 808; *See Albuquerque Rape Crisis Ctr. v. Blackmer*, 2005-NMSC-032, ¶ 20, 138 N.M. 398, 120 P.3d 820 (explaining that a "plain reading" of Article IV, Section 34 prohibits the retroactive application of statutes). Generally, there exists a presumption against retrospective legislation: "individuals, in planning and conducting their business, should be able to rely with reasonable certainty on existing laws." *City of Albuquerque v. State ex rel. Vill. of Los Ranchos de Albuquerque*, 1991-NMCA-015, ¶ 37, 111 N.M. 608, 808 P.2d 58. Where a statute "affects vested or substantive rights," or where retroactive application of a new law "would diminish rights or increase liabilities that have already accrued," prospective application may be required by the Constitution. *Gallegos v. Pueblo of Tesuque*, 2002-NMSC-012, ¶ 33, 132 N.M. 207, 46 P.3d 668 (internal quotation marks and citation omitted).

**{12}** Carrillo's assertions regarding the applicability of Section 60-1A-28.1 hinge on his argument that the legality of the racetracks' ongoing exclusion of him depends on our interpretation of the statute. However, nothing in the language of the Horse Racing Act indicates a legislative intent that Section 60-1A-28.1 should apply retroactively. This case is solely concerned with whether the October 29, 2012, April 13, 2013, April 19, 2013, and July 12, 2013, exclusions of Carrillo from Zia, Sunland, SunRay, and Ruidoso, respectively, were unlawful *at that time*, and not the validity of any future exclusions that the racetracks may or may not desire to enforce. As discussed more thoroughly below, to adopt Carrillo's interpretation of Section 60-1A-28.1 and apply it to this case on appeal would be to potentially render unlawful the racetracks' actions that were permissible under the common law at the time they were taken. Nothing in the plain language of the statute suggests the Legislature intended such a result. Applying the presumption against retroactive application of statutes, we conclude that Section 60-1A-28.1 does not apply to this case. We also must not interpret Section 60-1A-28.1 as to future exclusions, as doing so would be improperly advisory. *See Sena Sch. Bus Co. v. Bd. of Educ. of Santa Fe Pub. Sch.*, 1984-NMCA-014, ¶ 16, 101 N.M. 26, 677 P.2d 639 (stating the rule that this Court does not issue advisory opinions). The district court inexplicably listed Section 60-1A-28.1 as only one of its reasons

for granting the summary judgment motions; we must look to the other reasons that the district court enumerated in deciding whether the racetracks are entitled to summary judgment.

**B.      Common Law Right to Exclude**

**{13}**     Under Carrillo's interpretation of the common law, a racetrack has a much broader discretion in excluding patrons or ticket holders than it does in excluding trainers, owners, or jockeys—those holding occupational licenses granted by the Commission. He suggests that this distinction arises from a licensee's right to due process of law where he is lawfully denied an opportunity to engage in his chosen profession. As such, Carrillo insists that because licensees are heavily regulated by the Commission, they have a right to admission to the racetrack and a racetrack's right to exclude licensees is narrower than its right to exclude patrons.

**{14}**     The United States Supreme Court recognized a private racetrack's right to exclude in *Marrone v. Washington Jockey Club*, 227 U.S. 633, 636 (1913). Since then, many courts have continued to recognize a racetrack owner's common law right to exclude patrons. *See, e.g.*, *Nation v. Apache Greyhound Park, Inc.*, 579 P.2d 580, 582 (Ariz. Ct. App. 1978) (concluding that a racetrack may exclude a patron where no statute changed the common law right to do so). Some courts have also affirmed a racetrack owner's common law exclusion of licensees, such as owners, trainers, and jockeys. *See Calder Race Course, Inc. v. Gaitan*, 393 So. 2d 15, 16 (Fla. Dist. Ct. App. 1980) (affirming a racetrack's exclusion of a trainer, citing the common law right to exclude, and stating that private racing establishments "continue to have the right to choose those persons with whom they wish to do business"); *Greenfeld v. Md. Jockey Club*, 57 A.2d 335, 337-38 (Md. 1948) (affirming existence of common law right to exclude patrons, despite heavy regulation of racing through statute, so long as exclusion is not founded on race, creed, color, or national origin); *Catrone v. State Racing Comm'n*, 459 N.E.2d 474, 477 (Mass. App. Ct. 1984) (interpreting common law so that "a licensee racetrack at least may exclude licensed persons from participation in racing activity in the exercise of a reasonable business judgment"); *Marzocca v. Ferone*, 461 A.2d 1133, 1137 (N.J. 1983) (holding that a racetrack's common law right to exclude licensees exists "where the relationship is between the track management and persons who wish to perform their vocational activities on the track premises" (alteration, internal quotation marks, and citation omitted)); *Arone v. Sullivan Cty. Harness Racing Ass'n*, 457 N.Y.S.2d 958, 959 (N.Y. App. Div. 1982) (stating that ractrack operators' "long-recognized prerogative" of exclusion allowed a racetrack to exclude licensed trainers, drivers, and owners); *Bresnik v. Beulah Park Ltd. P'ship*, 617 N.E.2d 1096, 1097-98 (Ohio 1993) (affirming a racetrack's right to exclude "jockey agents" and characterizing the right to exclude as a long-standing "fundamental tenent of real property"). Carrillo conceded that this common law right exists during the summary judgment hearing in district court.

**{15}**     Looking to a rule that has been stated, accepted, and followed in other jurisdictions, we conclude that a privately owned racetrack possesses a common law right to exclude

individuals—both patrons and licensees alike. Of the courts and jurisdictions that have recognized a racetrack's common law right to exclude, some have limited that right based on the monopolistic nature of horse racing or on regulatory departures from the common law. We address each of these limitations in turn.

## 1.      Limitations on Common Law Right—De Facto Monopoly

**{16}**      Carrillo suggests that because each racetrack is required to hold a race only on dates pre-approved by the Commission and those dates are staggered throughout the year to allow for year-round racing in the state, the five racetracks in New Mexico have a monopoly over the racing industry in New Mexico. According to Carrillo, allowing racetracks to eject or exclude licensees within this monopolistic setting significantly impacts his ability to earn a living pursuing his occupation. Carrillo points to *Jacobson v. New York Racing Ass'n*, 305 N.E.2d 765 (N.Y. 1973) and *Cox v. National Jockey Club*, 323 N.E.2d 104 (Ill. App. Ct. 1974), as support for his assertion that the racetracks in this case have a monopoly and therefore possess a limited common law right to exclude licensees.

**{17}**      In *Jacobson*, the New York appellate court sought to determine whether the New York Racing Association (NYRA) could deny a licensee stall space under the common law rule allowing exclusion, thereby functionally barring the licensee from racing in the state. 305 N.E.2d at 766. The appellate court concluded that, as NYRA owned all but one of the racetracks in the state at the time, it had a "virtual monopoly." *Id.* at 768. In light of NYRA's monopoly position, the *Jacobson* court pointed out that exclusion from NYRA's track was "tantamount to barring the [licensee] from virtually the only places in the [s]tate where he may ply his trade." *Id.* The court also pointed out that allowing NYRA's exclusion would result in the practical effect of infringing on the state's power to license horsemen. *Id.* The court likened *Jacobson* to cases in which a licensed physician is excluded from receiving staff privileges or inclusion in medical societies, reasoning that "the arbitrary action of a private association is not immune from judicial scrutiny . . . where there is a showing of 'economic necessity' for membership and 'monopoly power' over the profession." *Id.* As a result, the *Jacobson* court concluded that in order to show that his exclusion, as a licensee, was unacceptable, the plaintiff had a heavy burden in having to "prove that the denial of stall space was not a reasonable discretionary business judgment, but was actuated by motives other than those relating to the best interests of racing generally." *Id.*

**{18}**      The Illinois appellate court reached a similar decision in *Cox*, holding that a private corporation, licensed by the state to conduct horse racing on private property, could not "arbitrarily deny a licensed jockey permission to participate in its racing meet." 323 N.E.2d at 107. The *Cox* court looked to the Illinois Horse Racing Act and determined that the legislature had intended to limit the competition between horse racing tracks by granting tracks a "quasi-monopoly" during certain specifically allotted racing dates. *Id.* at 108. The racetrack in that case was deemed to have a quasi-monopoly during its pre-allotted racing dates. *Id.* Thus, the *Cox* court held, "with the benefit of receiving a quasi-monopoly comes corresponding obligations one of which is not to arbitrarily exclude a jockey who desires to

8

participate in a racing meet." *Id.* It qualified its holding, however, by noting that the racetrack in that case excluded the licensee without giving any reason or justification for doing so, and explaining that "[i]f a legitimate and reasonable justification for exclusion is articulated the licensee conducting the horse racing meet would certainly be within the boundaries of acceptable behavior." *Id.* at 109.

**{19}** The cases limiting the common law based on the existence of a monopoly do so by disallowing *arbitrary* exclusions of licensees. Both *Jacobson* and *Cox* require some showing that a monopoly exists, as well as a showing that the exclusion is arbitrary rather than a decision based on "a legitimate and reasonable justification." *Cox*, 323 N.E.2d at 108-09; *Jacobson*, 305 N.E.2d at 768. Thus, we recognize that the common law right to exclude is limited when a racetrack has a monopoly, virtual monopoly, or quasi-monopoly. In that instance, the racetrack may eject or exclude a licensee only in the exercise of a reasonable business judgment or with legitimate justification.

**{20}** We note here that, although Carrillo suggests we analyze this case as though the racetracks hold a monopoly over the racing industry in this State, he does not provide enough facts for us to decide that issue and provides us with virtually no analysis of the issue. He does not cite to any statutes or regulations requiring only one race occur at any given time. *In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (1984). He does not provide any evidence that the racetracks are working together to create a monopoly. He makes no showing of economic necessity and provides no standards, rules, factors, or guidelines for this Court to implement in considering whether the racetracks possess a monopoly. Because of the inadequacy of Carrillo's argument on this issue, we decline Carrillo's invitation to characterize the racetracks in this case as a monopoly over the racing industry. This Court has no duty to review an argument that is not adequately developed. *Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701.

**{21}** Even if we were to conclude that the racetracks in this case held some sort of monopoly power over the racing industry in this State, Carrillo's argument that we must limit the racetracks' power to exclude still fails because he has not proven their actions were arbitrary, as we discuss further below. Having established the bounds of a racetrack's common law right to exclude or eject in New Mexico as well as the limitation on that right when a monopoly exists, we next determine whether the Commission has altered or amended the common law right to exclude through its promulgated regulations.

## 2. Limitations on Common Law Right—Regulations and Statutes

**{22}** Some jurisdictions have limited a private racetrack's common law right to exclude licensees because their legislature has explicitly expanded the protections afforded to licensees through rule or statute. *See, e.g.*, *Fox v. La. State Racing Comm'n*, 433 So. 2d 1123, 1126 (La. Ct. App. 1983) (holding that Louisiana statutory scheme prevents racetrack from unilaterally excluding a licensee of the state racing commission); *Burrillville Racing Ass'n v. Garabedian*, 318 A.2d 469, 471-72 (R.I. 1974) (holding that statute changed the

9

common law to require a determination as to whether the person ejected was undesirable); *PNGI Charles Town Gaming, LLC v. Reynolds*, 727 S.E.2d 799, 806-07 (W. Va. 2011) (acknowledging that the legislature limited the common law right to exclude to licensees). Generally in New Mexico, a common law rule remains effective until the Legislature explicitly alters it through a rule or statute:

> It is not to be presumed that the [L]egislature intended to abrogate or modify a rule of the common law by the enactment of a statute upon the same subject; it is rather to be presumed that no change in the common law was intended, unless the language employed clearly indicates such an intention. . . . [S]tatutes are not presumed to make any alterations in the common law further than is expressly declared, . . . [and t]he rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language.

*Guiterrez v. Gober*, 1939-NMSC-008, ¶ 14, 43 N.M. 146, 87 P.2d 437 (internal quotation marks and citation omitted). Rather than change the common law right to exclude, the Commission affirmed its existence in New Mexico by creating regulation 15.2.2.8(V) NMAC.[9] 15.2.2.8(V) NMAC provides:

> (1)     An association shall immediately eject from the association grounds a person who is subject to such an exclusion order of the commission or stewards and notify the commission of the ejection.

> (2)     An association may eject or exclude a person for any lawful reason. An association shall immediately notify the stewards and the commission in writing of any person ejected or excluded by the association and the reasons for the ejection or exclusion.[10]

We interpret Administrative Code regulations using the same rules applied in statutory interpretation. *Alliance Health of Santa Teresa, Inc. v. Nat'l Presto Indus.*, 2007-NMCA-157, ¶ 18, 143 N.M. 133, 173 P.3d 55. Interpretation of regulations is a legal issue, which we review de novo. *Id.* When interpreting a statute, courts strive to give effect to the Legislature's intent and look to the plain language of the statute to discern that intent. *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 9, 146 N.M. 24, 206 P.3d 135. Under a plain language analysis, courts give words "their ordinary meaning, unless the Legislature indicates a different one was intended." *Id.* (internal

---

[9]As stated earlier, we do not render any decision as to whether Section 60-1A-28.1 codifies this common law right to exclude or limits it.

[10]"Association" is defined as "an individual or business entity holding a license from the commission to conduct racing with pari-mutuel wagering." 15.2.1.7(A)(8) NMAC.

10

quotation marks and citation omitted). "When statutory language is clear and unambiguous, this Court must give effect to that language and refrain from further statutory interpretation." *Id.* (alteration, internal quotation marks, and citation omitted).

**{23}** The plain language of 15.2.2.8(V)(2) NMAC does not place any limitations on a racetrack's right to "eject or exclude." The definition of a "Person" under the Horse Racing chapter of the Code is expansive: "one or more individuals, a partnership, association, organization, corporation, joint venture, legal representative, trustee, receiver, syndicate, or any other legal entity." 15.2.1.7(P)(7) NMAC. The single qualifier in the regulation is that the exclusion be for a "lawful reason." This, like the common law rule discussed above, disallows exclusion or ejection that violates a person's civil rights. *See Greenfeld*, 57 A.2d at 338; *see also* NMSA 1978, § 28-1-7(F) (2004) (disallowing persons to make distinctions in "services, facilities, accommodations or goods . . . because of race, religion, color, national origin, ancestry, sex, sexual orientation, gender identity, spousal affiliation or physical or mental handicap"). Nothing in the plain language of the regulation suggests that it was intended to abrogate the common law right of exclusion. It is therefore unwarranted for this Court to conclude that 15.2.2.8(V) NMAC somehow altered a common law right when the two are virtually identical in language and scope. We agree with the district court's conclusion that the 15.2.2.8(V) NMAC is an affirmation, rather than a modification, of the common law right to exclude recognized in *Marrone*, 227 U.S. 633. By issuing a regulation that reiterates a racetrack proprietor's power to serve and do business with whomever it chooses, the Commission has emphasized that the common law right of racetracks to bar unwanted persons from their property remains intact, despite extensive State regulation of racing. Having established the existence of a racetrack's common law right to exclude in New Mexico, we now turn to the question of whether summary judgment was properly granted.

**C.      Summary Judgment Was Properly Granted**

**1.      Standard of Review**

**{24}** Summary judgment is proper where no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. *Roth v. Thompson*, 1992-NMSC-011, ¶ 17, 113 N.M. 331, 825 P.2d 1241; *see* Rule 1-056 NMRA. The movant has the initial burden of making a prima facie showing that he is entitled to summary judgment. *Roth*, 1992-NMSC-011, ¶ 17. A prima facie showing is "such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 10, 148 N.M. 713, 242 P.3d 280 (internal quotation marks and citation omitted). Once the movant has made a prima facie showing, the burden then shifts to the non-movant "to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Roth*, 1992-NMSC-011, ¶ 17. We note that a party "may not simply argue that such evidentiary facts might exist, nor may it rest upon the allegations of the complaint. Rather, the party opposing the summary judgment motion must adduce evidence to justify a trial on the issues." *Romero*, 2010-NMSC-035, ¶ 10 (alterations,

11

internal quotation marks, and citations omitted). Where the facts are not disputed and only the legal effect of the facts remains to be determined, summary judgment is appropriate. *Gardner-Zemke Co. v. State*, 1990-NMSC-034, ¶ 11, 109 N.M. 729, 790 P.2d 1010.

**2.      Carrillo Did Not Rebut the Racetracks' Prima Facie Showing That They Were Entitled to Summary Judgment**

**{25}**    In their motions for summary judgment, the racetracks asserted that they are entitled to summary judgment as a matter of law because they had no obligation to allow Carrillo entry and they had a common law right to exclude him. In support, the racetracks proffered undisputed evidence regarding the events leading up to and including Carrillo's exclusion.

**{26}**    It is undisputed that in September 2012 two of Carrillo's horses were injured and had to be moved by ambulance, and that later in October 2012 one of Carrillo's horses was injured so badly that it had to be euthanized. It is undisputed that all three incidents occurred at Zia Park. Zia Park put forth undisputed evidence that it was the subject of national scrutiny for incidents at its racetrack including injuries to horses and jockeys. For example, the New York Times ran stories in the Spring of 2012 that "disparaged the industry in New Mexico and raised allegations of impropriety . . . resulting in catastrophic injury and death of horses." Zia also produced evidence that it excluded Carrillo "[i]n order to protect the best interest of racing, the safety of the participants, and Zia Park's business interests[.]" Carrillo did not rebut this evidence, and instead acknowledged that "[e]nsuring the safety of race participants (including both equine athletes and human jockeys) is a legitimate concern" and "wanting to avoid negative publicity and public critique are understandable sentiments."

**{27}**    It is also undisputed that one of Carrillo's horses died on April 12, 2013, shortly after winning a race at Sunland Park. Sunland Park presented undisputed evidence that it excluded Carrillo based on an incident involving the death of one of Carrillo's horses and Carrillo's general "record at New Mexico tracks." Sunland further explained that it believed it was "in the best interest of horse racing" to exclude Carrillo from the track. These reasons were delineated in a letter that Sunland Park sent to Carrillo, notifying him of his exclusion. Similarly, SunRay Park presented evidence that it excluded Carrillo shortly after discovering that Carrillo's horse had died at Sunland Park in April 2013. SunRay Park based its exclusion of Carrillo on "concern about the safety of the horses and the reputation of the racing industry in New Mexico[.]" SunRay Park's letter to Carrillo notifying him of the exclusion was virtually identical to Sunland Park's letter, in that it based the exclusion on the incident resulting in the death of Carrillo's horse and Carrillo's "record at new Mexico tracks." It also explained that it believed Carrillo's exclusion was "in the best interest of horse racing."

**{28}**    It appears from the undisputed facts that in July 2013 Ruidoso Downs informed Carrillo that he had been excluded based on incidents that had occurred involving the death and injury of Carrillo's horses and Carrillo's record at other tracks. Specifically, Ruidoso Downs acknowledged the death of one of Carrillo's horses at Sunland park and the injury

12

of two of his horses at Zia Park. Ruidoso Downs explained that it excluded Carrillo out of concern for his horses and in order to "preserve the best interests and integrity of horse racing at Ruidoso Downs."

{29}    This evidence from the racetracks is adequate to establish a prima facie case of entitlement to summary judgment. The evidence creates a presumption that Carrillo was excluded in order to further a legitimate business interest of the tracks. The burden therefore shifted to Carrillo to proffer evidence to suggest a trial on the merits was necessary.

{30}    Carrillo did not dispute any of the racetracks' evidence. He instead responded with legal argument and assertions. Carrillo argued that he was excluded without cause and that the justifications given for his exclusion were "illusory." He did not, however, provide evidence that his exclusion was arbitrary. He neither presented any evidence of other similar incidents where other horses were injured or euthanized, nor established that other licensees were not excluded under circumstances similar to his. He provided no evidence that the racetracks intended to specifically harm him through exclusion. *See Fikes v. Furst*, 2003-NMSC-033, ¶ 21, 134 N.M. 602, 81 P.3d 545 (establishing a motive to harm as a requirement for a claim of interference with a contract); *Kitchell v. Pub. Serv. Co. of N.M.*, 1998-NMSC-051, ¶ 15, 126 N.M. 525, 972 P.2d 344 (listing an intent to injure as an element of prima facie tort).

{31}    Carrillo also asserted that he was improperly denied the process guaranteed by the Commission's regulations. Carrillo argues that he was denied the process set forth in the Administrative Code aimed at determining whether a racetrack had cause to deny entry. This argument envelopes the argument he makes on appeal that the racetracks are a de facto monopoly, infringing on the State's power to regulate horse racing. In making this argument, Carrillo cites to the rules set forth to govern procedure in stewards' hearings and commission proceedings. The conduct underlying this case, and of which Carrillo complains, is neither a stewards' hearing nor a commission proceeding. As such, the regulations do not guarantee Carrillo the "Due Process safeguards" to which he claims entitlement. *See* 15.2.1.9(A) NMAC ("This chapter contains the rules of procedure *for stewards' hearings and commission proceedings*." (emphasis added)).

{32}    In light of the undisputed nature of the evidence in this case, including national scrutiny of New Mexico racetracks, concern for the safety of participants, and desire to protect business interests, we conclude that the racetracks met their burden of making a prima facie case of entitlement to judgment as a matter of law. Carrillo then failed to present any contrary evidence or demonstrate the need for a trial on the merits. The district court therefore properly concluded that Carrillo did not meet his "heavy burden" of proving that exclusion was not a reasonable discretionary business judgment and properly granted summary judgment for the racetracks. *See Jacobson*, 305 N.E.2d at 768.

## III.    CONCLUSION

13

**{33}** We conclude that when they decided to exclude Carrillo from their property and participation in their races, Zia Park, Sunland Park, SunRay Park, and Ruidoso Downs all possessed a common law right to exclude Carrillo, despite the fact that he possessed a license from the Commission to participate in racing. We also conclude that the undisputed evidence supported the district court's conclusion that these racetracks had an adequate justification for excluding Carrillo, and their exclusion of him was not arbitrary. As such, we affirm the district court's order granting summary judgment for Zia Park, Sunland Park, SunRay Park, and Ruidoso Downs and dismissing the claims against them. It appears from the record, however, that Carrillo's claims against the Board of Stewards for each of these racetracks and against the Commission remain. We therefore remand so that these claims may be resolved in a manner consistent with this opinion.

**{34}** **IT IS SO ORDERED.**

_____
**RODERICK T. KENNEDY, Judge**

**WE CONCUR:**

_____
**LINDA M. VANZI, Judge**

_____
**M. MONICA ZAMORA, Judge**

14